**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **SAM BOWEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.  1:23-cv-118-RLY-TAB** |
| | ) | |
| **JAMES ISON,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S COMBINED BRIEF**
**IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND**
**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AS TO LIABILITY ON COUNTS ONE AND THREE**

## I.  INTRODUCTION

Sam Bowen ("Bowen"), then an officer with the Greenwood Police Department ("GPD") made a number of Facebook posts during the 2023 Mayoral Primary Election Campaign.  The posts were highly critical and unflattering of Police Chief James Ison ("Ison"), and incumbent Mayor Mark Myers ("Myers"), who was seeking reelection.  Some of the posts went so far as to say that Ison was "lying through his teeth."

This case poses the question whether a police chief can punish a police officer for social media posts critical and unflattering to the chief and the mayor when those posts were: (1) made as a private citizen, (2) made during an election campaign, (3) addressed matters of public concern, and (4) did not identify the officer as a police officer in any way.

## II.  STATEMENT OF GENUINE ISSUES[1]

A.     **STATEMENT OF GENUINE ISSUES WITH RESPECT TO DEFENDANT'S "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE."**

1.      **"In January of 2023, Chief Ison became aware that Bowen and at least one other Greenwood police officer were posting things on social media that were inconsistent with the department's Speech, Expression and Social Networking Policy (Policy 1026)." (Dfts.' Br., 6).**[2]

**Dispute:**      Policy 1026.2 states that "[d]ue to the nature of the work and influence associated with the law enforcement profession, it is necessary that ***members of this agency*** be subject to certain reasonable limitations on their speech and expression."  (Dfts.' Br., p. 7; Bowen Dec., ¶ 29).[3]  Further, Policy 1026.2 goes on to state that "the Agency will carefully balance the individual member's rights against the needs and interests against the needs and interests of the Agency when exercising a reasonable degree of control over its members' speech and expression." (Dfts.' Br., p.7)  Policy 1026.4 does, in fact, prohibit speech, even off-duty speech, that "is significantly linked to, or related to, the Agency and tends to compromise or damage the mission, function, reputation or professionalism of the Agency or its members[,]" as well as "[s]peech constituting treason, libel, slander, perjury, incitement to riot, or knowingly false statements regarding departmental operations or personnel."  (*Id*.; Bowen Dec. ¶ 31).  Employees of GPD are enjoined not to "criticize Department operations, policies, or personnel by speech, writing or expression in any other manner when such speech or expression is factually inaccurate or is made with reckless disregard for its truth or falsity."  (*Id*.; Bowen Dec., ¶ 34)

---

[1]In response to Defendants's Motion for Summary Judgment, and pursuant to L.R. 56(1), Plaintiff focuses on disputed facts that are material to the issues raised at summary judgment.  To the extent this matter is ultimately tried to a jury, Plaintiff reserves the right to dispute any and all factual issues as alleged by the Defendant.

[2]Citations to "Dfts.' Br., p. X" refer to the correspondingly-numbered page(s) of *Defendants' Combined Brief in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Their Cross-motion for Summary Judgment* [Dkt. # 49](internal citations omitted).

[3]Citations to "Bowen Dec., ¶X" refer to the correspondingly-numbered paragraphs in Exhibit A: *Declaration Under Oath of Sam Bowen*.

At the same time, Policy 1026.4.1 states that while GPD officers acting as "private citizens" are free to "[e]ndorse, support, oppose or contradict any political campaign or initiative[,]" as well as "to express their opinions as private citizens . . . on political subjects and candidates at all times while off-duty[.]" (Dfts.' Br., p. 8)(ellipsis in Dfts.' Br. (remaining alterations added); Bowen Dec., ¶ 28). Bowen's actions do not violate Policy 1026.4.1 because Bowen was not on duty or in uniform. (Ison Dep., p. 36:-13).

**3.** **"Under Indiana law, municipal primary elections were scheduled to be held on May 2, 2023." (Dfts.' Br., p. 9).**

**Dispute:** Indiana law requires a candidate for public office (i.e., Mayor, for instance) to *file his declaration* "not later than noon eighty-eight (88) days and not earlier than one hundred eighteen (118) days before the primary election." Ind. Code 3-8-2-4. Thus, one could consider that the *start* of the mayoral primary was 118 days before May 2, or January 4, 2023.

**4.** **"John Hubbard was running in Greenwood's 2023 municipal primary election to replace incumbent Mayor Myers as the Republican party's candidate for mayor in the November 2023 general election. Bowen did not live in Greenwood, and he could not vote in Greenwood's primary election, but he supported Hubbard because he did not like Mayor Myers and Chief Ison. (Dfts.' Br., p. 9).**

**Dispute:** Although Bowen did not *live* in Greenwood, he was employed there, and the results of the Greenwood mayoral primary were of significant interest. (Bowen Dec., ¶ 6). Police department transparency and police department morale were among several police and/or public safety questions at issue in the primary. (*Id*., ¶ 9).

**5.** **"Chief Ison was aware that Bowen was calling him a liar, saying that he was not fit to be chief, and things of a similar nature, but he felt that he could not address the matter because he did not want to be perceived as trying to punish Bowen for supporting Hubbard. [Ison Dep. p. 22, l. 7- 16; p. 25, l. 6 – p. 26, l. 20; Transcript of October 11, 2023, Greenwood Police Merit Commission Hearing at p. 83, l. 23 – p. 85, l. 25. ]" (Dfts.' Br., p. 9).**

**Dispute:** Quite simply, the first two citations given in the Defendants' Brief *do not contain any language that could be construed as saying what the Defendants claim.* As for the

final citation, to the transcript Greenwood Police Merit Commission hearing, while the Defendants

cite more than two pages of testimony, the language to which the Defendants refer is limited to lines

six through ten, on page 85.

More importantly, however, the Defendants' paraphrase of Ison's statement is not accurate.

What Ison actually said was

> I told her at the time that I felt that I was going to take the higher
> road, and that *I also felt that quite honestly that Officer Bowen was*
> *--* I did not want to give the impression by issuing discipline prior to
> the election that I was punishing officers for supporting a candidate.

(Hrg. Trans., p. 85:3-10)(emphasis added).[4]

Moreover, by the time Ison testified at the Merit Commission, Ison was already aware of

Bowen's lawsuit, which alleged that Bowen was punished for his Facebook posts.  (Hrg. Trans., p.

93:3-11; p. 94:8-13).

**6.      "In sum, Bowen contends that it is irrelevant whether his comments were**
**insubordinate because they were made on his own time in his capacity as a private citizen. Put**
**differently, it is Bowen's position that even if his comments were insubordinate or**
**"derogatory", they were protected by the First Amendment, and Chief Ison's suspension of**
**his take-home car and off-duty employment privileges violated the constitution." (Dfts' Br.,**
**p. 13).**

**Dispute:**       A Statement of the Facts should be a concise narrative of the facts stated in

a light most favorable to the judgment and should not be argumentative.  *Cnty. Line Towing, Inc. v.*

*Cincinnati Ins. Co*., 714 N.E.2d 285, 289 (Ind. Ct. App. 1999).  The statements above are not factual,

but rather, they are the Defendants' *interpretation* of Plaintiff's position, and are therefore

argumentative.

**B.      PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE**

---

[4] Citations to "Hrg. Trans., p. X:YZ" refer to the correspondingly-numbered pages and line(s) of Exhibit B: the written transcript hearing *In the Matter of RE: DISCIPLINE OF OFFICER SAMUEL BOWEN, October 11, 2023* before the Greenwood Police Merit Commission.

1.      The police chief can impose informal reprimands, suspensions and any other informal type of counseling.  (Ison Dep., p. 7:16-21).[5]

2.      Ison suspended Bowen's take-home-car and off-duty-employment privileges for violating the GPD's Standards of Conduct, GPD's policies on speech, expression, and social networking, and the City of Greenwood's ("City") policy on social media, based on multiple Facebook posts Bowen had made.  (Ison Dep., p. 13:2-7).

3.      In his posts, and in his Facebook profile, Bowen never identified himself as a Greenwood Police officer, and never appeared in a GPD uniform.  (Hrg. Trans., p. 143:20-144:9; Bowen Dec., ¶ 14).

4.      According to Ison, there was probably no way a member of the general public would know Bowen was a police officer unless the person knew Bowen personally.  (*Id.*)

5.      Greenwood's homicide rate rose dramatically during 2022.  (Ison Dep., p. 23:15-16).

6.      According to Bowen, "a lot of people in this police department can attest the past two years have been very different for Greenwood[.]" (Hrg. Trans., p. 146:13-15; Bowen Dec., ¶ 8).

7.      Following a spring Merit Commission meeting, president Wendy Trietsch ("Trietsch") told Ison that she was "bothered" by online posts from GPD officers she had seen.  (Hrg. Trans., pp. 84:24-85:3; Ison Dep., p. 25:6-16).

8.      Ison responded by telling Trietsch that, while some of the officers were not violating policy by supporting Myer's opponent, Joe Hubbard ("Hubbard") because they were on their own time, there were two officers[6] who were violating policy "by airing personal employee grievances, discussing department business, and being disrespectful towards other members of the [GPD.]" (Ison

---

[5] Citations to "Ison Dep., p. X:Y-Z" refer to the correspondingly-numbered page(s) and lines in Exhibit C: *Deposition of James Ison*.

[6] Bowen and Officer John McAtee.  (Ison Dep., p. 26:4-5).

Dep., pp. 25:17-26:5),

9.      Trietsch asked Ison why he was allowing it to continue.  (Hrg. Trans., pp. 84:24-85:3).

10.     Trietsch "advised [Ison]" that the Merit Commission could take action on its own. (Hrg. Trans., p. 85:11-13).

11.     Ison waited until election night and "discipline[d]" Bowen by suspending his take-home-car and ODE privileges.  (Hrg. Trans., p. 86:8-16).

12.     Ison believes the issue of police department transparency would be an issue of public concern, depending on the context, and whether supporting facts and circumstances were presented. (Ison Dep., pp. 26:21-27:12).

13.     If Bowen was not a police officer, Ison "would not have an issue with it because he wouldn't be under [Ison's] purview and under [GPD's] policies."  (Ison Dep., p. 28:20-24).

14.     GPD Policy 1026.4 Speech and Expression prohibits certain speech "unless the speech is otherwise protected by law, for example, speaking as a private citizen on a matter of public concern."  (Ison Dep., p. 30:10-16; Bowen Dec., ¶ 32; Ex. D).[7]

15.     Bowen is not required to agree with Ison's opinion that Bowen's "personal grievances" are a matter of public concern.  (Ison Dep., p. 30:10-31:1).

16.     Bowen disagrees with Ison's opinion that the GPD is being transparent.  (*Id.*, p. 33:6-9).

17.     In fact, the only problem Bowen has with GPD is Ison's lack of transparency.  (Hrg. Trans., p. 162:18-21).

18.     According to Bowen, during the period leading up to the primary, GPD morale "was

---

[7] Citations to "Ex. D" refer to Plaintiff's Exhibit D: GPD Policy 1026.

at the lowest point it's ever had, and . . . most officers would attribute that to stuff that's coming from the administration."  (Hrg. Trans., p. 164:9-14; Bowen Dec., ¶ 10).

19.     Bowen's actions did not violate Policy 1026.4.1 because Bowen was not on duty or in uniform.  (Bowen Dec., ¶¶ 13, 14; Ison Dep., p. 36:913).

20.     Policy 1026 states that "[m]embers retain their rights to vote as they choose, to support candidates of their choice, and to express their opinions as private citizens on political subjects and candidates at all times while off duty."  (Ison Dep., p. 38:12-18; Bowen Dec., ¶ 28; Ex. D).

21.     All of Bowen's posts were made in the context of the primary election.  (Ison Dep., p. 41:2-4; Bowen Dec., ¶ 11).

22.     Joseph Hubbard was Mayor Mark Myers' opponent in the 2023 mayoral primary. (Myers Dep., p. 9:6-8; Bowen Dec., ¶ 5).[8]

23.     During the primary, Myers ran on the issues of public safety, increasing the size of the police department and our fire departments, bringing new business to the community, helping the communities assess valuations, continue to grow, redevelopment and economic development. (*Id*., p. 9:17-23; Bowen Dec., ¶ 9).

24.     It was a pretty intense mayoral primary, and Bowen, who was supporting a different candidate that Ison, wanted to share his opinions.  (Hrg. Trans., p. 171:11-16).

25.     Bowen was of the opinion that there needed to be a change in the GPD, that the "current trajectory was not . . . beneficial to the public or to the officers."  (Hrg. Trans., pp. 172:25-173:4).

26.     The most Bowen ever shared was a news article that was already publicly available.

---

[8] Citations to "Myers Dep., p. X:YZ" refer to the correspondingly-numbered page(s) and lines in Exhibit E: *Deposition of Mark Myers*.

(Hrg. Trans., p. 172:6-12).

  27. Ison never wrote Bowen up for violating policies, he merely told Bowen that taking away Bowen's take-home car and ODE privileges was at Ison's "sole discretion."  (Hrg. Trans., p. 172:13-19).

  Additional facts will be supplied as required.

## IV.  SUMMARY OF THE ARGUMENT

## V.  ARGUMENT[9]

### A. THE SUMMARY JUDGMENT STANDARD

  "[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Peoples State Bank v. First Sec. Leasing, Inc.*, 2012 U.S. Dist. LEXIS 8491, *6 (S.D. Ind. Jan. 25, 2012)(internal quotations omitted).  In ruling on a motion for summary judgment, the court must review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.*, at *6-7.

  Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  The Court's job does not extend to weighing the evidence, determining credibility issues of resolving swearing contests. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.  1997).  After drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Am. Gen. Life Ins. Co. v. Germaine Tomlinson Ins.*

---

[9]After a thorough review of the evidence, and in view of the Seventh Circuit's strict standard with respect to summary judgment, the Plaintiff elects to forego his claims pursuant to 42 U.S.C. § 1981a (Counts 2, 4, and 6).

*Trust*, 2010 U.S. Dist. LEXIS 103730, *9 (S.D. Ind. 2010)(internal citations omitted).

**B.**     **BOWEN'S FACEBOOK POSTS WERE PROTECTED BY THE FIRST
        AMENDMENT.**

> To show that his speech is protected under the First Amendment,
> [Bowen] – a public employee—must demonstrate that (1) he made
> the speech as a private citizen, (2) the speech addressed a matter of
> public concern, and (3) his interest in expressing that speech was not
> outweighed by the state's interests as an employer in 'promoting
> effective and efficient public service.

*Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018)(internal quotation marks omitted;

brackets added).  Whether the employee's speech was constitutionally protected is a question of law

to be decided by the court.  *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013).

**1.**     **Bowen was speaking as a private citizen.**

Whether Bowen spoke as an employee or a citizen when he made his Facebook postings

depends on whether the postings were made pursuant to his official duties.  *Id.*  "So long as

employees are speaking as citizens about matters of public concern, they must face only those speech

restrictions that are necessary for their employers to operate efficiently and effectively."  *Garcetti*

*v. Ceballos*, 547 U.S. 410, 419 (2006).  The proper inquiry is a practical one, and includes formal

job requirements and the employer's real rules and expectations.  *Davis*, 889 F.3d at 845.

First, GPD Policy 1026 Speech, Expression and Social Networking is clear that"this policy

does not limit a member from speaking *as a private citizen*, about *matters . . . of public concern*,

such as misconduct or corruption."  (Ex. D:  Policy 1026.1, ¶ 3; Bowen Dec., ¶ 28).

Moreover, Policy 1026.4.1 provides that members are not restricted from "[e]ndors[ing],

support[ing], oppos[ing] or contradict[ing] any political campaign or initiative" as private citizens,

although they may not do so if they appear to represent the Greenwood Police Department, or

"identify themselves in any way that could be reasonably perceived as representing the Agency[.]"

(Ex. D: Policy 1026.4.1, ¶ 1; Bowen Dec., ¶ 33). But the logical corollary of this statement is that an officer who does **not** identify himself as a GPD office in any way **is acting as a private citizen.**

Here, it is should be undisputed that Bowen was speaking as a private citizen.

First, Bowen made the Facebook posts on his own time. (Bowen Dep., pp.70:19-20, 85:2-10).[10] The posts expressed his personal opinion, and were made on his personal Facebook page. (*Id*., pp. 82:23-83:2). Bowen never identified himself as a Greenwood police officer, nor did he ever appear in a GPD uniform when making his posts. (SOAMF, ¶ 3;[11] Bowen Dep., pp. 81: 23-82:1, 85:5-10; Bowen Dec., ¶ 14). Moreover, Bowen never posted any photos that showed the Greenwood Police Department's logo, Greenwood police department equipment, or any member of the Greenwood Police Department, and nothing on Bowen's Facebook profile page identified Bowen as a GPD officer. (Bowen Dec., ¶¶ 14, 15).

In short, there was no way a member of the general public would have known Bowen was a police officer unless the person knew Bowen personally. (*Id*., ¶ 4; Bowen Dec., ¶ 36).

In any event, the Defendants concede that Bowen was acting as a private citizen when he posted on Facebook. (Dfts.' Br., p. 15).

### 2. Bowen's posts addressed matters of public concern.

The Defendants argue that Bowen's social media postings did not address matters of public concern. (Dfts.' Br., p. 16). They base this contention on the fact that Bowen "knowingly, intentionally, and publicly called his ultimate supervisors disrespectful names like "liberal mark myers (*sic*) and yes man James Ison." (Dfts.'s Br., p.17). The Defendants also note, correctly, that

---

[10] Citations to "Bowen Dep., p. X:Y" refer to the correspondingly-numbered page(s) and line(s) of Exhibit F: *Deposition of Sam Bowen*.

[11] Citations to "SOAMF, ¶ X" refer to the correspondingly-numbered paragraph(s) in the *Plaintiff's Statement of Additional Material Facts In Dispute*, Part II(B), above.

Bowen accused Ison of "lying through his teeth," called Myers' administration a "gang," and referred to Myers as "the Nancy Pelosi of Johnson County – a failed career politician who has no understanding of what the people he represents want and refuses to listen[,]" and made several other unflattering remarks. (*Id.*)

The Defendants' argument here would be more appropriately located in Section C of their brief, which addresses the balancing test, which weighs Bowen's interests in posting his comments against the Defendants' interest in promoting the efficiency of the public services GPD provides. (Dfts.' Br., p. 23). That is where Bowen will respond directly to the Defendant's argument in this section. However, to provide a foundation for that discussion, it is necessary to understand how one determines whether speech addresses a matter of public concern.

Whether speech is a matter of public concern involves an examination of the "content, form, and context of a given statement, as revealed by the whole record." *Glass v. Dachel*, 2 F.3d 733, 740 (7th Cir. 1993). The content of the speech is the most important of these considerations. *Id*. The Supreme Court has elevated speech on public issues where "debate is vital to informed decisionmaking by the electorate." *Id*.

Elections are matters of public concern. *Trump v. United States*, 144 S. Ct. 2312, 2338 (2024). A speech made during an election campaign is clearly a matter of public concern. *Caruso v. De Luca*, 81 F.3d 666, 671 (7th Cir. 1996). "Leafletting and ***commenting on matters of public concern*** are classic forms of speech that lie at the heart of the First Amendment." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 205 (2021)(citing *Schenck v. Pro-Choice Network of Western N. Y.*, 519 U.S. 357, 377(1997). Speech, even speech critical of a political candidate, is a matter of public concern in an election year. *Brown v. Disciplinary Comm. of Edgerton Volunteer Fire Dep't*, 97 F.3d 969, 973 (7th Cir. 1996).

Thus, issues raised in an election would, by definition, be issues concerning which "debate is vital to informed decision[ ]making by the electorate."  Moreover, it is obvious that "speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern."  *Id.*, (alteration added).

Here, Bowen was, first and foremost, posting his comments on a Greenwood-oriented Facebook page in the context of an "pretty intense" mayor primary election.  (SOGI, ¶ 2;[12] SOAMF, ¶¶ 21, 24).  Bowen wanted to share his opinions in the "pretty intense mayoral primary."  (*Id.*, ¶ 24).  During the primary, Myers, whom Ison supported,  ran on the issues of public safety and increasing the size of the police and fire departments.  (*Id.*, ¶ 23).  During the period leading up to the primary, GPD morale "was at the lowest point it's ever had."  (*Id.*, ¶ 23).  Ison admits that the issue of police department transparency could be a matter of public concern, (SOAMF, ¶ 12).

If Bowen was speaking as a private citizen, as he clearly was, and the topic of his speech was a matter of public concern, which it clearly was, his speech was protected unless his interest in speaking, and in participating in the public debate preceding the 2023 mayoral primary, is outweighed by the Defendants' interest in maintaining the efficiency and morale of the Greenwood Police Department.

**3.**    **Bowen's interest in participating in the public debate preceding the 2023 mayoral primary outweighs the defendants' interest in maintaining the status quo of the Greenwood Police Department.**

The Defendants claim that, even though Bowen's posts addressed a matter of public concern, they were not protected because they were insubordinate.  (Dfts.' Br., pp. 14-15).  Government employees do not relinquish their First Amendment right to freedom of speech as a condition of public employment.  *Domiano v. Vill. of River Grove*, 904 F.2d 1142, 1145 (7th Cir. 1990).

---

[12] Citations to "SOGI, ¶ X" refer to the correspondingly-numbered paragraph(s) in the *Statement of Genuine Issues With Respect to Defendant's "Statement of Material Facts Not in Dispute*, page 2, above.

Nevertheless, the First Amendment "is not a license for insubordinate speech that impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace." *Id*., (emphasis added).  In determining whether Bowen's speech was protected, one must begin by asking whether Bowen sought to bring what he perceived as problems with Ison's candor and lack of transparency toward the public, or morale problems within the department, to the attention of the public.  *Glass*, 2 F.3d at 741.

### a.   Bowen's comments were *not* insubordinate, and they neither interfered with Bowen's job performance nor affected the GPD's efficiency.

Considering Bowen's post in the context of the period during which they were posted, as well as the conversations in which they were posted, it is clear that Bowen was participating in a multi-party discussion about crime, crime rates, crime reporting, and police morale.  (Ex. H).[13]  In every instance, Bowen is responding directly to a comment made by another participant in the conversation.  (*See, e.g.* Ex. H, p. 1, responding to Eric McCormick; p. 2, same; p. 3, same (2x); p. 4, same (2x); p. 5, responding to Jay Hart; p.5, responding to Tracy Rumble; p. 6, same; p. 6, responding to Mark E Thompson; p. 7, same; p. 7, responding to Jonathan David; p. 8, responding to Devon Lamont Davis (2x); p. 9, responding to Joe Papaw Williams; p. 9, responding to unknown poster; p. 10, same).

The Defendants describe Bowen's posts as not "helpful," and not "productive," "in informing the public debate on the issues of crime, transparency in reporting crime, the morale of officers with the GPD, or the integrity of Mayor Myers and Chief Ison."  (Dfts.' Br., p. 17).  "It is nothing more than rude, hostile, disrespectful, immature name-calling and personal attacks."  (*Id*.)  That, Bowen's remarks may be, but they are clearly not "insubordinate."

---

[13] Citations to "Ex. H" refer to Plaintiff's Exhibit H: Bowen's Facebook Conversations.

The only evidence that the Defendants have presented to support the accusation of insubordination are Ison's repeated assertions that Bowen's posts were insubordinate and disruptive. (Ison Dep., pp. 15:9-12; 27:13-15; 33: 20-23; 47:16-20).

The Cambridge Dictionary defines insubordinate as "(of a person) not willing to obey orders from people in authority, or (of actions and speech, etc.) showing that you are not willing to obey orders[.]" https://dictionary.cambridge.org/us/dictionary/english/insubordinate, visited September 15, 2024. Dictionary.com defines insubordinate as "not submitting to authority; disobedient[.]" https://www.dictionary.com/browse/insubordinate, visited September 15, 2024.

The Defendants cite to the case of *Green v. City of Montgomery*, 792 F. Supp. 1238 (M.D. Ala. 1992),[14] a thirty-year-old district court case from another circuit in which the court upheld police officer's termination for calling the mayor a "liar," finding the officer's conduct was "rude." Defendants also cite to *Fitzgerald v. Nations*, 610 S.W. 2d 48, 50 (Mo. Ct. App. 1980), in which a police officer was terminated for calling his Captain a "damn liar." *Id*.

Neither *Green* nor *Fitzgerald* is analogous to this case.

In *Green*, the Court noted that the question is whether the detrimental impact, if any, of the expression on the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees outweighs the interests of the police officer, as a citizen, in commenting upon matters of public concern." 792 F. Supp. at 1251. The Court noted that it must consider " whether and to what extent the speech in question threatened to disrupt the workplace, impair discipline by superiors or harmony among co-workers, or interfere with the speaker's duties or the regular operation of the enterprise." *Id*. Finally, even if an employee has prevailed at each of

---

[14] Interestingly, in *Green* , the Court noted that it is clear that the term matters of "public concern" embraces a wide variety of speech directed to political, social, economic, and cultural issues of substantial, legitimate interest to the public." 792 F.Supp., at 1251.

the previous steps, an employer may still avoid liability by demonstrating that it would have reached the same adverse decision with respect to the employee's job even in the absence of the protected speech. *Id.*, at 1252.

It is significant that in *Green*, the Court held that

> all of the officers . . . were clearly addressing issues of public concern. Furthermore, defendants have not attempted to justify punishing such officers for these first-amendment activities on the basis of any interference . . . to the efficient operation of the police department; ***even if they had, the interests of plaintiffs in such exercise of their constitutional rights – at least as to those claims that otherwise have merit—overwhelmingly outweigh any resulting disruption or impairment of the police enterprise.***

792 F. Supp. at 1253–54 (alterations and emphasis added).

More to the point, however, the language in *Green* to which the Defendant's refer, was ***dicta***. *Id.*, at 1264.  The police officer involved had already retired before the case was decided and his claim was time-barred.  It was only ***after*** thus disposing of the officer's claims that the Court noted, " the court is convinced that Brantley was punished not for his speech itself—his belief that Folmar had betrayed him – but rather for his rude manner toward Folmar. The first amendment does not protect rudeness." *Id*.  The Court also found that the officer's expression ***did not address a matter of public concern.*** *Id*.

In *Fitzgerald*, the Plaintiff posted a note on the precinct bulletin board, in response to a statement by a senior officer that there was no "quota system" in that precinct. *Id.*, at 49.  The note said "Well I'll call Major Bergauer, the Colonel, the Police Board, [a County Supervisor], the [St. Louis County] Council, any supervisor, or, commandor (sic) a damn liar to their face, if they tell me that there is no 'quota' system in the 1st Prct.; and that officers haven't and aren't punished for not participating or competing. Fitz." *Id*.

When asked at roll call by his Captain if he had written the note, Fitzgerald answered

affirmatively. *Id.* The Captain then stated that there was no "quota system" in the precinct, whereupon Fitzgerald, as he had promised to do, called the Captain a "damn liar." *Id.*

The court in *Green* noted that, even if the Defendants here had attempted (which they do not) to "justify punishing such officers for . . . first-amendment activities on the basis of any interference . . . to the efficient operation of the police department . . . , ***the interests of plaintiffs in such exercise of their constitutional rights – at least as to those claims that otherwise have merit—overwhelmingly outweigh any resulting disruption or impairment of the police enterprise***. 792 F. Supp. at 1253–54 (alterations and emphasis added).

Here, Bowen's posts may be critical, unhelpful, unproductive, unflattering, and even harsh. They are ***not*** insubordinate, nor do they support a reasonable inference that the posts interfered with either Bowen's performance or GPD's efficiency. Nothing the Defendants have presented provides support for the proposition that Bowen was "not willing to obey orders from [Ison]," or that he ever actually failed to submit to authority, or disobeyed orders. Even more clearly, the Defendants have submitted no evidence to show that Bowen's posts either ***interfered with Bowen's ability to perform his duties, or interfered with the proper functioning of the GPD.*** *Domiano*, 904 F.2d at 1145.

i. The Defendants' reliance on *Kokkinis* is misplaced.

The Defendants rely most heavily on *Kokkinis v. Ivkovich*, 185 F.3d 840 (7th Cir. 1999).

Kokkinis, a Bridgeview, Illinois police officer, came to have an extremely negative view of his Chief, Vladimir Ivkovich. *Id.*, at 841. After a female officer alleged sex discrimination in the Department, Kokkinis appeared on a news program, where the reporter introduced him by saying, "[A]nother officer, who did not want to be identified, feels [the female officer] is unfairly being chosen for [a particular] assignment, and says the residents of Bridgeview should know the situation inside the police department." *Id.*, at 842.

-16-

Kokkinis then appeared on camera, behind a screen, wearing a mask, and with his voice electronically altered.   Kokkinis said "If [the residents of Bridgeview] really knew what was going on, I think they would be in utter shock."   When the reporter asked, "Why?" Kokkinis replied, "Because they are clueless as to what is going on. Everybody is so afraid of the Chief's vindictiveness. If you even dare to question any decision he makes, basically your life will be made miserable." *Id*.

The broadcast bothered Chief Ivkovich because he believed Kokkinis' comments were untrue, and reflected negatively on the department.   *Id*.   Ivkovich worried that the broadcast would undermine his efforts to build the department's esteem.  Ivkovich's view was shared by other ranking officer, who saw the broadcast as a "mockery of the department" that "cast a negative light on the members of the department and was a discredit to the department as a while." *Id*.

After Kokkinnis admitted he was the masked speaker, Ivkovich suspended Kokkinis for five days although the suspension was ultimately reversed by the Board of Police and Fire Commissioners. *Id*.

However, in the period between the suspension and its reversal, there occurred a sequence of events that prompted Ivkovich to take other actions.   Koklinis accidentally shot himself, fellow officers discovered that Mr. Kokkinis was "keeping book" on them; problems developed between Kokkinis and his supervisors; and Kokkinis began taking prescription medication due to stress. *Id*. Ivkovich ordered Mr. Kokkinis to undergo psychological evaluation, which concluded that Kokkinis' problems with authority rendered him unfit for work within a quasi-military organization like a police department. Ivkovich placed Kokkinis on administrative duty in the station and denied his request for secondary employment as a bank security guard because it involved carrying a firearm. *Id*., at 842-43.

The facts in Kokkinis bear little resemblance to the facts here.  Bowen did nothing to identify himself as a GPD office while participating in an ***online political discussion concerning issues of GPD's transparency with respect to reporting and characterizing the crime problem, police department morale, and whether Greenwood had a "crime problem," all of which were matters of public concern <u>in that election.</u>***  (Bowen Dec., ¶ ; SOGI, ¶¶ 3, 4, 5; SOAMF, ¶¶ 8, 12, 18, 21, 23, 24, 25).

On the other hand, although Kokkinis appeared incognito on a television news program, he was ***identified*** on camera as a Bayview police officer.  Moreover, Kokkinis purported to discuss sex discrimination ***in his own department***. While sex discrimination in the police department is, inarguably, a matter of public concern, it was not a matter of public concern in the ***only election around that time locally***, the special election for Illinois' Second Congressional District. https://en.wikipedia.org/wiki/1995_Illinois%27s_2nd_congressional_district_special_election, visited September 16, 2024.  In fact, Bridgeview is not even in the Second Congressional District. https://en.wikipedia.org/wiki/Bridgeview,_Illinois, visited September 16, 2024.

Furthermore, Bowen was, even by Ison's own admission, a "good active officer."  (Hrg. Trans., p. 56:9-10).  On the other hand Kokkinis was effectively separated from the police department because of his problems with authority.

Finally, the Defendants in *Kokkinis* noted that Ivkovich saw the "broadcast as an embarrassment to himself and to the department as a whole, ***especially after he received phone calls about the broadcast, including one from the former chief***."  *Kokkinis* 185 F.3d at 842.  *Kokkinis* also noted specifically that Ivkovich "worried that the broadcast would adversely affect morale among the officers by undermining his efforts to build the department's esteem."  *Id*.

    ii. The Defendants have presented no evidence that Bowen's post actually created any problems for Ison or the GPD.

Here, the Defendants argue that Bowen's speech "had the ***potential*** to create problems in maintaining discipline and harmony within GPD." (Dfts.' Br., p. 23)(emphasis added).  Further, say the Defendants, "Bowen's postings were clearly intended to encourage others to think badly of the Chief[.]"  (*Id*., p. 24).  The Defendants offer not a single piece of evidence to explain how they divined Bowen's actual purpose in posting his comments.

They go on to argue that Bowen's posts "created both actual and potential problems for the Chief."  (*Id*.)  However, the only "actual problem[ ]" the Defendants raise is that Bowen's postings "made it difficult for the Chief to manage ***Bowen*** [because t]he Chief felt constrained from addressing Bowen's postings lest he be perceived as trying to punish officers for supporting Hubbard."  (*Id*.)(emphasis added).  If, in fact, this was a problem for Ison, it is one of his own making.

When Trietsch told Ison she was "bothered" by online posts made by GPD officers, Ison told her that there were only two officers who were violating policy "by airing personal employee grievances, discussing department business, and being disrespectful towards other members of the [GPD.]" (SOAMF, ¶ 8).  Ison told Trietsch the other officers were ***not*** violating policy because they were on their own time.  (*Id*.)  This is significant because it shows that Ison understood that Bowen was posting his comments on his own time.  (*Id*.)

There is also some possible evidence that Ison, at the time he was initially approached by Trietsch, did not believe Bowen was doing anything wrong, rather than "airing personal employee grievances, discussing department business, and being disrespectful towards other members of the GPD.

At his deposition, Ison testified that he told Trietsch " I felt that I was going to take the higher road, and that ***I also felt that quite honestly that Officer Bowen was --*** I did not want to give the

-19-

impression by issuing discipline prior to the election that I was punishing officers for supporting a candidate." (SOGI, ¶ 5).  A reasonable juror, hearing that statement, could reasonably infer that Ison intended to say that he "also felt that quite honestly" Officer Bowen was ***not*** really violating policy.

The Defendants also argue that Trietsch's expressed "concern" over the postings showed that Bowen's postings had caused problems for GPD among the public.  However, because Trietsch is the President of the Police Merit Commission, and therefore a ***political appointee***, her "concerns" can hardly be considered equivalent to a genuine ***public*** expression of concern.

In all, while the Defendants discuss, at great length, the ***potential*** for Bowen's posts to disrupt the efficiency of the GPD, they cite no evidence that Bowen's remarks ***actually*** reduced the efficiency of the GPD.

        **c.**      **Bowen's speech did *not* conflict with his responsibility to foster a relationship of trust between the police and the public, because Bowen was not identifiable as a Greenwood police officer in any of his posts.**

The Defendants next contend that "Bowen's speech directly conflicted with [his] responsibility as a police officer to foster a relationship of trust and respect with the public." (Dfts.' Br., p. 25).  The problem with this argument is simple: Bowen's posts could only harm the reputation of the GPD ***if Bowen was known to be a GPD officer***, and as Ison himself admits, there was probably no way a member of the general public would know Bowen was a police officer unless the person knew Bowen personally.  (SOAMF, ¶ 4).

        **d.**      **Bowen's speech was *not* "recklessly uninformed.**

The Defendants' fourth argument is that "the manner of Bowen's postings reveals that they were recklessly uninformed."  The Defendants say that Bowen's statement (as they interpreted it) that "Mayor Myers and Chief Ison were more concerned about 'policing their police and tanking morale at the department' than public safety," is recklessly uninformed.  (Dfts.' Br., p. 26).

What the Defendants refuse to understand, though, is that public safety, and thus all aspects of GPD's administration, management, efficiency, and morale, where matters of public concern *in the election campaign that was then underway*.  We know these were campaign issues because Meyers himself says that he ran on the issue of public safety.  (SOAMF, ¶ 23).  As a police officer, Bowen was a in a position to have "informed and definite opinions" on the subjects of public safety, police transparency, GPD morale, and Ison's leadership, "question[s on which] free and open debate is vital to informed decision-making by the electorate."  *Pickering*, 391 U.S. at 571–72 (alteration added).

It is clear that Bowen's view was not "recklessly uniformed." or even negligently uniformed.  It simply differed from that of the Defendants.

If one goes through the entire litany of Bowen's supposedly "recklessly uninformed" opinions put forth by the Defendants, one finds the same result in every instance.  The problem with Bowen's opinions, at least from the Defendants' point of view, is that Bowen's opinions were simply contrary to the Defendants, which does not make Bowen either wrong, or uninformed.

### e.    Bowen did *not* post his Facebook comments because he received what he thought was an unfair reprimand.

As their fifth bite at the apple, the Defendants claim that Bowen posted his comments on Facebook because he resented having "received what he thought was an unfair reprimand and his effort to get both the public and the GPD's rank-and-file members, or at least those on his shift, to think that Chief Ison was a hypocrite." (Dfts.' Br., pp. 26-27).  The evidence the Defendants cite for this claim is a single statement from a March 3, 2023, post in which Bowen posted a story from that days, Greenwood *Daily Journal*.  (Ex. G).[15]

---

[15] Citations to "Ex. G" refer to Plaintiff's Exhibit G: Bowen's SM Post (also filed by Defendants as Bowen Dep., Ex. 5).

The original online story from the newspaper was titled "Greenwood chief responds to claims

crime has doubled in city."  (*Id*.)  When Bowen posted the story to his Facebook page, he said,

> Greenwood city officials are trying to mislead you to think there is
> not a grave problem. Crime is up and they should not be able to get
> away with blatantly lying to the public in hopes to skew an election.
>
> Rules for thee (sic) and not for me.

(*Id*.)  Bowen's comment is directly related to the new article.  His statement "Rules for thee (sic) and

not for me" bears no relationship to the disciplinary writeup Bowen received.  Moreover, given the

context in which the comment appears, a reasonable fact finder could find that Bowen's comment

was an integral part of his response to the article.

> f.    **The fact that Bowen's comments *may* have been "rude, hostile,
> disrespectful, immature name-calling and personal attacks" does *not*
> mean the posts did not inform the public debate in a meaningful way.**

> The Constitution does not guarantee good feelings or regulate
> manners in political disputes. Toward the ends of liberty and self-rule,
> the Constitution's embrace of free speech and popular elections
> ensures robust and sometimes even rude public discourse. These side
> effects of liberty and representative government are well-known. If
> the transient evils of an election accidentally severs two friends, the
> electoral system brings a multitude of citizens permanently together.
> Freedom produces private animosities, but despotism gives birth to
> general indifference.

*Manley v. Law*, 889 F.3d 885, 889 (7th Cir. 2018)(internal quotations, citations, and alterations

omitted).  Public debate – and elections are perhaps the quintessential example of public debate –

must be "uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and

sometimes unpleasantly sharp attacks on government and public officials."  *Id*. quoting *New York

Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Assuming, solely for the sake of this motion, that Bowen's posts were nothing more than

"rude, hostile, disrespectful, immature name-calling and personal attacks," the Defendant's have

presented no evidence that those posts fall into any category of speech for which the government Defendants can punish Bowen.

**g.      Bowen *cannot* be regarded as "an aggrieved employee."**

This may be the Defendants' strangest argument.  First, the theory that Bowen made his posts because of "his resentment over having received what he thought was an unfair reprimand" is the product of sheer divination.  None of Bowen's posts refer, in even the most insinuative way, to his reprimand.  The only basis for the Defendants' claim is that, in his deposition, when asked about a minor write-up he had received, Bowen when asked by the Defendants' counsel if he thought the write-up was "unfair," agreed.  (Bowen Dep., p. 155:10-14).  There is nothing in Bowen's answer, and the Defendants proffer no evidence themselves, that would allow a rational fact-finder to infer that Bowen's election-year posts were in any way prompted by receiving what the Defendants themselves referred to as a "minor write-up."  This argument is complete and unsupported speculation and invention on the part of the Defendants.

What is even more confusing about this argument is that the Defendants argue that, based on the argument, Bowen should be considered "an aggrieved employee" rather than "a member of the general public."  This is confusing because the Defendants have already conceded – at least for the purposes of their summary judgment brief, that Bowen was acting as a private citizen when he made his posts.  (Dfts.' Br., p. 15).  Either Bowen was acting as an "aggrieved employee," or he was acting as a private citizen.  He cannot have acted as both.

**C.      ISON IS NOT ENTITLED TO QUALIFIED IMMUNITY IN HIS INDIVIDUAL CAPACITY.**

Since Ison has raised the qualified immunity defense, it becomes incumbent on Bowen to show that Ison violated a constitutional right, and that the right was clearly established at the time of Ison's actions.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Bowen can do this by pointing to

closely analogous cases that establish that the conduct was unlawful, or that demonstrate that the violation was so obvious that a reasonable government official would know that his actions violate the Constitution. *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2011).

> To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. The crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced.

> The Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality. It is not enough that the rule is suggested by then-existing precedent. The precedent interpret must establish the right that particular very the plaintiff officials to apply. Otherwise, the rule is not one that every reasonable official (sic) know.

> In other words, the level of generality is appropriate when it establishes the rule in a way that tells a public employee what the Constitution requires in the situation that employee faces. In the context of a First Amendment retaliation claim, a plaintiff cannot overcome qualified immunity by putting forward cases that "demonstrate little more than that the First Amendment right against retaliation, writ large, is clearly established.

> First Amendment retaliation claims put fact-intensive considerations at play, including whether the plaintiff spoke on a matter of public concern, and whether the defendant's reaction to the plaintiff's speech was justified. Accordingly, ***the crux of the qualified immunity issue here is whether Bowen can come forward with case law that would have informed Chief Ison that Bowen's <u>social media postings</u> were on a matter of public concern and whether the Chief's action in response to Bowen's social media postings was justified.***

(Dfts.' Br., pp. 28-29)(internal citations, quotations, and alterations omitted; emphasis added).

The Defendants' analysis is flawless – almost. The Defendants have badly misstated the object of Ison's actions. The question is ***not*** whether Bowen's ***social media postings*** were on a matter of public concern. Instead, the issue is whether Bowen's ***right to speak freely, even though he was a police officer, during an election in which public safety, including the issues of crime, crime reporting, and police morale were matters of public concern.***

The answer to that question is inarguably, "Yes."

### 1.     Bowen's social media postings were clearly on a matter of public concern.

The Supreme Court has elevated speech on public issues where "debate is vital to informed decisionmaking by the electorate." *Glass*, 2 F.3d at 740.  Elections and election speech are ***clearly*** matters of public concern. *Trump*, 144 S. Ct. at 2312, 2338; *Caruso*, 81 F.3d at 671.  Speech that focuses on police departments (and ultimately police protection and public safety) also involve matters of great public concern. *Brown*, 97 F.3d at 973.

The 2023 mayoral primary campaign began on January 4, 2023.  (SOGI, ¶ 3).  Myers was being challenged for the Mayor's office by Joe Hubbard.  (*Id*., ¶ 4).  Police department transparency and police department morale were among several police and/or public safety questions at issue in the primary.  (*Id*.)  Myers was running on the issues of public safety and increasing the size of the police department.  (SOAMF, ¶ 23).  Ison admits that the issue of police transparency could be a matter of public concern. (*Id*., ¶ 12).  All of Bowen's posts were made in the context of the primary election. (SOAMF, ¶ 21).

### 2.     Ison's action in response to Bowen's social media postings were clearly *not* justified.

Government employees do not relinquish their First Amendment right to freedom of speech as a condition of public employment.  *Domiano*, 904 F.2d at 1145.  Although the First Amendment is not a license for insubordinate speech, insubordinate speech is limited to that which "impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace." *Id*.  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

Bowen made the Facebook posts on his own time, expressing his own opinion, on his own

personal Facebook page.  (Bowen Dep., p.70:19-20; 82:23-83:2).  He never identified himself as a

Greenwood police officer, or appeared in a GPD uniform when making his posts.  (SOAMF, ¶ 3;[16]

Bowen Dep., p. 85:5-10; Bowen Dec., ¶ ).  He never posted any photos that showed the Greenwood

Police Department's logo, Greenwood police department equipment, or any member of the

Greenwood Police Department, and nothing on Bowen's Facebook profile page identified Bowen

as a GPD officer.  (Bowen Dec., ¶¶ ).

     If Bowen was had not been a police officer, Ison would not have an issue with Bowen's posts.

(Ison Dep., p. 28:20-24).

### 3.    Bowen's right to speak freely in an election, without fear of retaliation, and that Ison's reaction was not justified,  was well established, and Ison knew, or should have known of that right.

    That Bowen's posts, in and election year, and on issues central to the election, addressed

matters of public concern, and that Ison had no right to retaliate against Bowen for speaking is well

established by existing case law.  In addition to the case cited above, the Court can look to *Davis*,

889 F.3d 842 (7th Cir, 2018);  *Volkman*, 736 F.3d 1084 (7th Cir, 2013);  " *Garcetti v. Ceballos*, 547

U.S. 410 (2006); *Glass*, 2 F.3d 733 (7th Cir. 1993); *Caruso*, 81 F.3d 666 (7th Cirr. 1996);  *Brown*,

97 F.3d 969 (7th Cir. 1996); and *Domiano*, 904 F.2d at 1145 (7th Cir. 1990).

    And of course, there are the *grande dames* of public employee free-speech cases:  *Lane v.

Franks*, 573 U.S. 228 (2014)(considerable value in encouraging, rather than inhibiting, speech by

public employees; government employees are often in best position to know what ails the agencies

for which they work); *Connick v. Myers,* 461 U.S. 138 (1983)(whether employee's speech addresses

a matter of public concern must be determined by the content, form, and context of given statement,

as revealed by the whole record); and, of course, the *grandest dame* of all, *Pickering v. Bd. of Ed.*

---

[16] Citations to "SOAMF, ¶ X" refer to the correspondingly-numbered paragraph(s) in the *Plaintiff's Statement of Additional Material Facts In Dispute*, Part II(B), above.

*of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968)( members of community most likely to have informed and definite opinions on matters of public concern must be able to speak out freely on such questions without fear of retaliatory dismissal).

It is clear that Ison's claim of qualified immunity must fail.

## VI. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment should be DENIED.

Respectfully submitted,

  *s/  Jay Meisenhelder*
Jay Meisenhelder, Atty No. 19996-49
JAY MEISENHELDER EMPLOYMENT
& CIVIL RIGHTS LEGAL SERVICES, P.C.
650 North Girls School Road, Suite D40
Indianapolis, IN  46214
Office Telephone:     317/231-5193
Direct Telephone:     317/899-9220
Facsimile Number:    317/982-5463
Email Address:        jaym@ecrls.com

## CERTIFICATE OF SERVICE

I certify that on September 21, 2024, the foregoing was filed electronically.  Copies will be sent to all counsel of record by operation of the Court's CM/ECF system.

I certify that on September 21, 2024, true and accurate copies of the foregoing were served on the following counsel of record for the Defendants by electronic mail, and/or first-class United States Mail, postage prepaid, and addressed as follows:

Pamela G. Schneeman (#18142-53)          pschneeman@cjklaw.com
Rosemary L. Borek (#20036-41)            rborek@cjklaw.com
CLARK JOHNSON & KNIGHT, LTD.
11590 N. Meridian Street, Suite 650
Carmel, IN  46032
Phone: (317) 844-3830
FAX:  (317) 573-4194

                                  *s/  Jay Meisenhelder*