Exhibit B

**In the Matter Of:**

RE DISCIPLINE OF OFFICER SAMUEL BOWEN

**GREENWOOD POLICE MERIT COMMISSION**

*October 11, 2023*



Telephone: 765.644.3040
EMAIL: info@cardinalcourtreporting.com

GREENWOOD POLICE MERIT COMMISSION

CITY OF GREENWOOD

STATE OF INDIANA      )
                      ) SS:
COUNTY OF JOHNSON   )

IN RE THE DISCIPLINE OF
OFFICER SAMUEL BOWEN

REPORT OF PROCEEDINGS had at the disciplinary hearing of the above-entitled matter before the GREENWOOD POLICE MERIT COMMISSION, CITY OF GREENWOOD, INDIANA, commencing on the 11th day of October, 2023, at the hour of 5:00 p.m., at the Greenwood City Center, 300 South Madison Ave., Greenwood, Indiana.

CARDINAL COURT REPORTING
P.O. Box 249
Morristown, IN  46161
Telephone:  (765) 644-3040
info@cardinalcourtreporting.com

A P P E A R A N C E S

GREENWOOD POLICE MERIT COMMISSION:

Wendy Trietsch, Chair

Mike Sherman

Chris Zaborowsky

Tom Brogan

Martha McQueen

Linda Meier, Counsel


ON BEHALF OF SAMUEL BOWEN:

    Jay Meisenhelder, Esq.
    JAY MEISENHELDER EMPLOYMENT &
    CIVIL RIGHTS LEGAL SERVICES, P.C.
    650 North Girls School Road, Suite D40
    Indianapolis, IN  46214
    317.231.5193
    jaym@ecrls.com


ON BEHALF OF CHIEF ISON AND GREENWOOD
POLICE DEPARTMENT:

    Beth Copeland, Esq.
    OF COUNSEL, TAFT LAW
    One Indiana Square, Suite 3500
    Indianapolis, IN  46204
    317.713.3592
    bcopeland@taftlaw.com

I N D E X

WITNESS:                                           PAGE:

ANDREW FOSTER
  Direct by Ms. Copeland..................14
  Cross by Mr. Meisenhelder..............50


ASST. CHIEF MATTHEW FILLENWARTH
  Direct by Ms. Copeland..................55
  Cross by Mr. Meisenhelder..............59
  Redirect by Ms. Copeland...............64
  Re-Cross by Mr. Meisenhelder...........65
  Further Redirect by Ms. Copeland.......70


CHIEF JAMES ISON
  Direct by Ms. Copeland..................73
  Cross by Mr. Meisenhelder..............92
  Redirect by Ms. Copeland..............108
  Re-Cross by Mr. Meisenhelder..........115


DONEISHA POSEY (Via Zoom)
  Direct by Ms. Copeland.................120
  Cross by Mr. Meisenhelder.............133
  Redirect by Ms. Copeland..............138
  Re-Cross by Mr. Meisenhelder..........139


CHIEF JAMES ISON
  Direct by Mr. Meisenhelder............141
  Cross by Ms. Copeland.................144


SAMUEL BOWEN
  Direct by Mr. Meisenhelder............145
  Cross by Ms. Copeland.................152
  Redirect by Mr. Meisenhelder..........171
  Re-Cross by Ms. Copeland..............176

INDEX OF EXHIBITS

EXHIBIT NO.                              Intro./Admitted

1  7-6-2023 E-mail.......................18/20

2  7-12-2023 Memorandum.................21/22

3  7-14-2023 Correspondence.............23/25

4  7-14-2023 E-mail chain...............26/27

5  Electronic Communications Report
   (36 pages)...........................30/30

6  GPD Policy 321.......................78/78

7  GPD Policy 422.......................78/78

8  GPD Policy 320.......................78/78

9  "Charges and Specific Conduct That
   Comprise the Charges"................80/81

10 Electronic Communications Report
   (4 pages)............................88/89

D  Facebook posts.......................94/NA
   (12 pages)

H  Notice of Counseling/Reprimand.....100/102
   (Eck)

I  Notice of Counseling/Reprimand.....104/NA
   (Wehnert)

(Reporter's Note:  Quotation marks are used for clarity and do not necessarily reflect a direct quote.)

MS. TRIETSCH:  Calling to order the meeting of the Greenwood Police Merit Commission.  This is October 11, 2023.  This is a special meeting and a disciplinary hearing.  At this time I'm going to ask the members to introduce themselves.

MR. ZABOROWSKY:  Chris Zaborowsky.

MR. SHERMAN:  Mike Sherman.

MS. TRIETSCH:  Wendy Trietsch.

MR. BROGAN:  Tom Brogan.

MS. MCQUEEN:  Martha McQueen.

MS. TRIETSCH:  And this is our attorney Linda Meier.

At this time Linda is going to give a few brief comments on procedure and such.

MS. MEIER:  Thank you, Madam President.  I'm going to ask everyone present to check your phones and make sure they are on silent so there's no phone calls or rings or anything.  There will not be any recordings allowed or videos permitted except by the court reporter or by the press.

And just to explain an administrative hearing, here is usually how it works.  To

the extent necessary and for full disclosure of all relevant facts and issues, the parties shall be afforded the opportunity to present evidence and argument, conduct cross-examination, submit rebuttal evidence, and to respond.  The Greenwood Police Merit Commissioners may ask a few questions of the witness also, to which the parties will be given -- the attorneys will be given the opportunity to follow up on the Commissioners' questions.

The court reporter is seated over here.  She will administer the oath to the witnesses.  This hearing is being recorded by our court reporter and at the expense of the Greenwood Police Merit Commission.  If either party requests a transcript, the request is to be made to our court reporter and at the party's expense.

The evidence presented this evening may be in the form of testimony, documents, affidavits, video, photographs, and the like. The Merit Commissioners are only allowed to consider the evidence admitted into the record during this hearing.  And as I

mentioned, this is an administrative hearing, and so thus, the Merit Commissioners may consider evidence that would not otherwise be admitted under Indiana Rules of Evidence. And the purpose is to provide all parties the opportunity for a fair and impartial review of the issues before the Commission.

Hearsay evidence may be admitted, but the Commissioners may not use it as the sole reason to base their decision. I like to conduct this as a hearing and I borrow from a method used by an administrative law judge friend of mine, and he borrows it from a former Andy Griffith show years ago. It's a hearing, and therefore the people have their right to be heard. And so it will be a little less formal than a normal court proceeding.

If you all need a break or to take a recess at any time, ask the Commissioners and they can recess for a brief intermission to allow you to refresh yourself or use the facilities. And I believe out this door over here to my left is where the public restrooms are.

So is the police department ready to call its first witness?

MS. COPELAND: Can we give a brief opening?

MS. MEIER: Certainly, yes. Each party has the opportunity to give an opening. And then I know we discussed during a pretrial conference whether or not you were to have any stipulated facts or evidence. Have you been able to stipulate to anything currently?

(No response.)

Okay. All right. Yes, go ahead and state your -- present your opening statements at this time.

MS. COPELAND: Thank you. Ladies and gentlemen of the Commission, my name is Beth Copeland, and I represent the police chief in the matter that has been brought before you this evening. Chief Ison has recommended the termination of Officer Sam Bowen for violating three Greenwood Police Department policies. Policy 321, Information Technology Use; Policy 422, Mobile Data Center Use; and Policy 320, Standards of

Conduct.

The evidence you will see and hear will overwhelmingly prove he violated these policies when he repeatedly used obscene, indecent, profane, and derogatory language on his City-issued laptop while he was patrolling your city streets.  The evidence I present tonight may offend you, and I apologize in advance for the words that I am going to have to say.

You are going to hear that this officer, who was sworn to serve and protect and to always do so professionally, with skill, character, and honor, repeatedly wrote things to his shiftmates, like dirty Jew, fag, faggot, queer, 13 Percenter, coon, bitch, slut, and retard.  You are going to hear how this officer, while driving around in his City-issued police vehicle, slung insults at African Americans, Mexicans, the Jewish community, homosexuals, females, and even the disabled, the depressed, and veterans.  This language is not locker room talk, and is not immature banter.  It is racist, defamatory, and at times went so far

as to suggest racial profiling.  No amount of I'm sorry undoes this type of damage by a police officer.

We have four witnesses we will present tonight.  First you will hear from the assistant city attorney who will explain how and why the City's legal department discovered these instant messages.  You will hear from Assistant Chief Fillenwarth, and how his role in the Internal Affairs investigation, and Chief Ison who will explain how Officer Bowen violated policy and why he no longer deserves to be a police officer.

(Zoom interruption.)

And finally, you'll hear from who just appeared out of the sky via Zoom.  She is -- excuse me.  She is a subject matter expert in the field of race and discrimination.  She will explain the impact of Officer Bowen's racist remarks and how they not only affect the police department and the members that are on it, but also how they affect your community as a whole.

At the conclusion of tonight's

evidence you will have two questions to answer. The first will be, did Officer Bowen's conduct violate GPD policy. That answer we are confident will be a resounding yes based on the evidence that you see. The second question that you will have to answer is, does his -- did his violations -- excuse me, do his violations warrant termination from this department. Again, we believe that must be yes based on the evidence you will see. His conduct was so severe and pervasive it cannot be tolerated. We thank you for your time and attention this evening.

MS. MEIER: Mr. Meisenhelder?

MR. MEISENHELDER: Members of the Commission, my name is Jay Meisenhelder. I represent Officer Bowen. And without meaning to be disrespectful, I have to disagree with Ms. Copeland on one issue at the beginning, and that is, there's only one question that you have to answer tonight, and that is whether Officer Bowen's conduct merits termination.

We'll stipulate, and Officer Bowen will testify that, yes, in fact, he did

engage in the conduct that the City alleges. But one thing that Officer Bowen is going to talk to you about is the context in which this occurred. And contrary to what Ms. Copeland has suggested, this is not racial profiling. There is no allegation that Officer Bowen's conduct was ever translated into the way he performs his job, the way he treats the citizens of Greenwood, and the way he upholds the law, which is what he's sworn to do.

What you're going to hear is that, in fact, Officer Bowen, like most police officers, regularly has to deal with incredibly stressful and incredibly discouraging situations. And that sometimes he and other police officers, including his shift mates, simply have to release some of the tension and they do it with what they felt at the time was humor. That's a normal thing to do. Officer Bowen will tell you he's not proud of what he did. He realizes that it was a violation of the rules. But when the evidence is over, you're going to be convinced, I believe, that in light of a

couple of things, his conduct does not merit termination. What are those things? Number one, discipline should be relatively proportional to the offense. And similar offenses should be punished similarly. And second, one has to consider the motivation of Chief Ison in recommending termination.

We're going to show you that, in fact, Chief Ison's decision to recommend Officer Bowen's termination is just part of continuation of a reprisal against Officer Bowen based on the fact that Officer Bowen filed the lawsuit against the City and against Chief Ison for violating his First Amendment rights.

When you've heard that, and you consider the animus that Chief Ison bears towards Officer Bowen, and the way that that has translated itself into his actions thus far, we believe that you will come to the conclusion that while Officer Bowen should be terminated -- or should be disciplined, termination is far beyond what his actions merit. Thank you.

MS. MEIER: Are you ready to

proceed?  Call your first witness.

MS. COPELAND:  Drew Foster.

(Witness is sworn.)

EXAMINATION BY MS. COPELAND:

Q.  Could you please state your name for the record.

A.  Andrew K. Foster.  I go by Drew.

Q.  Where do you currently work?

A.  City of Greenwood.

Q.  In what capacity?

A.  I have been assistant city attorney for approximately ten months.

Q.  Prior to being the assistant city attorney, what type of law did you practice?

A.  Criminal law.

Q.  You were a criminal prosecutor?

A.  Yes, ma'am.

Q.  How long were you a criminal prosecutor?

A.  Little over 19 years for Johnson County.

Q.  And just for the non-lawyers in the room, prosecutor is criminal?

A.  Criminal.

Q.  Assistant city attorney?

A.  Civil.

Q.  Civil.  What kind of cases did you handle

when you were prosecutor?

A. I started out doing seatbelt tickets in the Greenwood City Court. By the end of my time at the prosecutor's office, I was mostly handling major felonies. I did all the search warrants during business hours, after hours. All the homicides, I was involved in, things of that nature.

Q. Do you know Officer Sam Bowen?

A. Not personally. I've met him professionally when I was at the prosecutor's office.

Q. You had interactions with him when you were a prosecutor?

A. Yes, ma'am.

Q. If he was an arresting officer on a case?

A. Yes. I don't believe I ever met him in person. It was mostly late night phone calls giving search warrants.

Q. Have you interacted with him much in your capacity as assistant city attorney?

A. I don't believe I ever have.

Q. Fair to say, you're not friends?

A. No.

Q. You don't hang out socially?

A. No, ma'am.

Q. But you're also not enemies?

A. No.

Q. You have no animus against him?

A. No. I've never met him personally -- or in person.

Q. Are you aware of a lawsuit that he filed against the City?

A. Yes, I believe I received the notice of that July 5th or July 6th of this year.

Q. Can you briefly tell the Commission what Officer Bowen is alleging in that lawsuit?

A. He alleges we violated his -- I believe breach of contract in violation of his First Amendment rights by taking away his take-home patrol vehicle, by posting comments on Facebook, and I believe a breach of contract of his contractual obligation with the City to have that take-home vehicle.

Q. Did you know he was going to file a lawsuit?

A. I did not.

Q. After you received a copy of his lawsuit, what did you start to do?

A. I -- at some point you have to conduct discovery, and that's kind of a layman's way of saying you've got to give the other side

everything you have, they have to give whatever they have to you. As part of that, you want to preserve documents, let everyone know that, hey, we've been sued. Whether it's someone who slipped and fell at the pool and cut their leg or something like this, you're going to want all the records for that.

So the normal thing would be is, what I did in this case is, contact the City IT and the County in order to put a hold on all instant messages, e-mails, things of that nature.

Q. So -- and forgive me, I had to manipulate my phone. You started to perform what we call discovery.

A. Yes.

Q. That's a legal term of art. Can you help further explain, forgive me, what exactly discovery is in a lawsuit?

A. Discovery is -- again, you give the other side all the information you have, they give the information they have, so you're not going into this process blind. We don't have trial by surprise in this country. Everybody

gets to know the information ahead of time.

Q. And this is a process that a police officer would be very familiar with, correct?

A. Oh, yes. I mean, as deputy prosecutor, I would oftentimes say, hey, preserve your body cam, I need any notes for your OWI, you did your little field sobriety notebook thing. It's fairly common.

Q. So there's nothing special or unique about this case.

A. No.

Q. You started to collect discovery like you would in any other lawsuit.

A. Correct.

Q. Did you notify the Chief that you were going to request these instant messages from the County?

A. I did not.

Q. I am going to show you what I have marked as Exhibit 1.

(Whereupon, Exhibit 1 was introduced.)

BY MS. COPELAND:

Q. Can you identify that document, please.

A. That is an e-mail I sent to Bill Foote with

the Johnson County Dispatch Information Center requesting -- I believed he was the Spillman administrator.  I explained that I'm an assistant city attorney now, if he could put an investigative hold on all the e-mails, IMs from Officer Bowen, getting a hold on it just so -- I didn't know what their storage date was, so I just want to make sure that those were preserved and nothing happened to them because, again, in discovery, you don't want to be the party where the other side is saying, hey, they got rid of that information for us.  Because it could be exculpatory, it could be inculpatory.  Could be to the other side's benefit, so you don't want to get crossways with the court when the lawsuit proceeds.

Q. What's the date of this document?

A. July 6, 2023.

Q. And did you author it?

A. Yes, I did.

Q. Is it a true and accurate copy?

A. Yes, ma'am.

            MS. COPELAND:  I would move to introduce and publish.

MR. MEISENHELDER:  No objection.

MS. MEIER:  It's admitted.

MS. COPELAND:  And I have copies for everybody, if they would also like --

MS. MEIER:  Yes, please.  Go ahead and distribute those.

BY MS. COPELAND:

Q.  And, again, just so we can go through this, what's a Spillman administrator?

A.  Well, Spillman is proprietary software all law enforcement in Johnson County uses, whether it's Greenwood, New Whiteland, Trafalgar, the County.  It's a database that stores actually probable cause affidavits, it has dispatch notes, evidentiary pictures are uploaded to that.  It's also an e-mail system where the officers and the prosecutor's office can communicate in an instant message system, or the officers can communicate with dispatch, with other agencies, with the fire department.  That's just the system we use in Johnson County.

Q.  And -- and it says --

(Phone ringing.)

MS. MEIER:  Silence your phone.

BY MS. COPELAND:

Q. -- very clearly in here that you recently received a lawsuit filed by a current employee?

A. Yes.

Q. And you would like to request that his communications be preserved?

A. Correct.

Q. This was your initial communication in order to start that process?

A. Yes.

Q. I'm going to show you what's been marked as Exhibit 2.

(Whereupon, Exhibit 2 was introduced.)

BY MS. COPELAND:

Q. Are you familiar with Exhibit 2?

A. Yes, I am.

Q. What is this document?

A. This is a document that was sent to the department heads that were involved in the lawsuit indicating we've been sued and that -- essentially it's a preservation request for all the departments again. Much like I was doing with Dispatch or Spillman

administrator, this is a letter we -- City Legal sent out to the police department and other departments in the city to preserve information.

Q. Do you know if this document was disseminated?

A. It was.

Q. And what's its date?

A. July 12, 2023.

Q. Is this a true and accurate copy of what was disseminated?

A. Yes, ma'am.

MS. COPELAND: I would move to introduce and publish.

MR. MEISENHELDER: No objection.

MS. MEIER: Admitted.

Counsel, do you have copies?

MS. COPELAND: I do.

MS. MEIER: If you have an extra one, would you give the court reporter a copy so she can have it.

MS. COPELAND: Yeah, I will give her all of mine.

BY MS. COPELAND:

Q. Okay. And again, this communication was

created in an effort to notify the Greenwood PD, Legal Department, Human Resources Department, and the IT Department to preserve all of Sam Bowen's documents.

A. Correct.  And this is pretty standard any time the City is sued.

Q. This would include like his personnel file?

A. Correct.

Q. Now I'm going to show you what's been marked as Exhibit 3.

(Whereupon, Exhibit 3 was introduced.)

BY MS. COPELAND:

Q. Can you identify this document, please.

A. Correct.  This is a document we received from Knight Hoppe Kurnik and Knight.  It's the law firm that represents the City in the lawsuit Sam Bowen filed against the City.  Unlike -- you would think the City Legal Department would handle these type of things, however, like everybody, we're insured, much like if you're in a car accident.

So the insurance company hires their own attorney to represent us.  This is a letter from the insurance -- insurance company's

attorney letting us know, again, to also
preserve evidence and get everything in line
for discovery.

Q. So that's an important point to bring up.  So
in this lawsuit, the City has insurance?

A. Correct.

Q. And it retained a carrier in order to provide
that litigation -- defense in the litigation?

A. Correct.

Q. I think you've already said you did not
author this document?

A. I did not.

Q. But you received it from outside counsel?

A. Yes, I did.

Q. Is this a true and accurate copy of what you
received?

A. Yes, ma'am, it is.

Q. Can you identify the date?

A. July 14, 2023.

Q. And it's two days after the memo that you
sent to all the City departments, is that
correct?

A. Yes.

Q. And about a week after the lawsuit was filed?

A. Thereabouts, yes.

MS. COPELAND: Move to introduce and publish.

MR. MEISENHELDER: No objection.

MS. MEIER: Admitted.

BY MS. COPELAND:

Q. I'm going to ask you to turn to page 2, specifically. Did you know that the insurance attorney would sent you this?

A. Yes. Based on other lawsuits that are filed against the City since I've been here, it's, again, a pretty standard letter that I've received every time.

Q. And what is she asking you to preserve in paragraph 3?

A. She's asking to the extent necessary that you have them, all documents, electronic communications, Facebook postings, e-mails, text messages and the like, relating to Bowen's criticisms of Mayor Myers and Chief Ison, including those on the Facebook pages, Greenwood Chatter and Greenwood Indiana Crime Tracker, referenced in paragraph 8 of Bowen's complaint.

Q. Okay. So you've been asked to preserve by outside counsel electronic communications,

e-mails, and text messages?

A. Correct.

Q. Did the County respond to your e-mail?

A. Yes, they did.

(Whereupon, Exhibit 4 was introduced.)

BY MS. COPELAND:

Q. Can you identify that document, please.

A. This is a series of e-mails I received from Heath Brant and Shelly Chesser from Johnson County Dispatch in reference to my initial communications. They all worked in administering Spillman.

Q. Have you seen this document?

A. Yes.

Q. You're part of these e-mail exchanges?

A. Yes, ma'am.

Q. When did the County finally respond to your request?

A. The -- initially July 6th. And I didn't -- I got sidetracked with other work-related issues. I got back to them on July 14th, and that's when we got things taken care of.

Q. So the same day that outside counsel said, hey, do this --

A.  Yes, and then that's what reminded me to follow up.

Q.  And the County responded.

MS. COPELAND:  Move to introduce and publish.

MR. MEISENHELDER:  No objection.

MS. MEIER:  Did you say no objection?

MR. MEISENHELDER:  I did.

MS. MEIER:  Admitted.

BY MS. COPELAND:

Q.  I am going to point your attention to the very bottom of this first page.  From you to Spillman IT, Johnson County 911.  July 14th.

"I would say from today going back two years if that isn't too much trouble."

If you need context, I can go to the day before.  Why did you request two years' worth of his IT messages?

A.  Based on my experience in the prosecutor's office, I believed there would just be a lot of communications.  I didn't want to overburden the Dispatch down at the County. I felt a lot of times in legal proceedings two years is the appropriate, not

overburdensome time frame you want to go back and counsel will ask you to get.

Q. That's specific -- typical statute of limitations --

A. Correct.

Q. -- correct?  It's pretty common practice?

A. Yes, ma'am.

Q. Had you ever requested Officer Bowen's instant messages from the County before?

A. Up to that point I've never requested anybody's instant messages before.

Q. Had any other police officers to the City in the ten months that you've been there?

A. No, ma'am.

Q. So there was no need?

A. Correct.

Q. Do you recall how many pages you received in response to the request?

A. I believe it was somewhere in the area of 5,200 and some odd pages.

Q. If I tell you 5,320, would you believe me?

A. Yes.

Q. Once you received them, what did you do with them?

A. I got them in a PDF format, and I decided,

because I figured that outside counsel might ask me to do this, I started to go through them. I initially focused on the time frame in and around the election because that's what the lawsuit directly referenced. So I started scrolling down and started seeing other terms, just because I used my mouse in scrolling down, when it would stop I saw words and phrases that gave me pause.

Q. Such as?

A. The language you referenced in your opening that I'm hesitant to say in a public setting, but referring to people as Jews or dirty Jews, homo, things of that nature. Again, having been a deputy prosecutor, and, again, at this point my job was to be concerned for litigation for the City, I was concerned of what -- how he was conducting himself as an officer.

MS. COPELAND: I will represent to the Commission that this is 5,300 text messages -- pages of text messages. But for the sake of brevity, I'm not introducing all of them. There's more pages here than -- where some of the key conversations happened,

but I didn't -- I wanted to be able to provide context.  So bear with us as we kind of go through this.  It may seem expansive, but I wanted to make sure that there was no accusation of misrepresentation.

(Whereupon, Exhibit 5 was introduced.)

BY MS. COPELAND:

Q.  I would like to go through Exhibit 5 with you, if you're okay with that, sir?

A.  Absolutely.

MS. COPELAND:  And it would be most convenient at this time to introduce it even though I've not laid a foundation for them.  Is there any objection to letting the Merit Commission see them at this point?

MR. MEISENHELDER:  No.  No objection.  In fact, we'll stipulate to the admissibility of these.

MS. COPELAND:  Great.

BY MS. COPELAND:

Q.  Let's go through Exhibit 5.  And, again, forgive me for some of the things that I have to say.

On the far left it represents the

date and time of when the communication occurred.  So the first highlighted one here, just to give reference, is January 8 of '23. It shows the time that it was taken.  "F", I assume means "from", and then "Bowen S" would be the defendant.  The other officers' names are also in here.  Unfortunately, I do have to mention some of their comments just to give you context.

But first one, "This chick barricaded herself in her room."

"Is she fat?"

"Where was the SWAT call."

"SWAT callout out on an ID" --
intermediate detention.

"Way to be a team player."

"The last suicidal call -- the last suicidal guy that SWAT got called on ended well."

"IS."

"SHE."

"FAT."

"Didn't know it was the sambo show."

"No, she is like 150 pounds."

"Argh.  Sounds like something a

stupid fatty would do."

"And LT" -- lieutenant -- "was with me.  No way I could make a callout."

"You can make a callout on anything."

"Believe and you will achieve."

"Did you just hear that pistol rack?"

"Lmfao."

Bowen is the highlighted.

"I just expertly negotiated."

"She had furniture moved in front of the door and everything."

"Or pull Zane's, there is a piece of a piece of a weapon piece in here."

This is the language.

"Good thing she wasn't mentally challenged, right Sam?"

"Lmao" -- laughing my ass off -- "if LT wasn't there, 100 percent would have tased."

Were there on a mental distress call.

"Good thing Lieutenant was there. Would have been tased."

Skip to the next page.

"What a dumb bitch.  What does she possibly think I can do."

"I'm feeling an autism brawl tonight,
Sam."

"Yeah, I feel it too."

"Shift needs a bill 2.0."

"I could go for one."

Now, Officer Bowen didn't make the
first comment, but he --

MR. MEISENHELDER:  Madam
President, at this point I would object to
this.  Ms. Copeland is simply testifying.
We've introduced the communications, they
speak for themselves.  I see no reason why
Ms. Copeland has to read them into the record
at this point.  If she has a question for
Mr. Foster about specific passages, let her
ask them.

MS. MEIER:  Your response?

BY MS. COPELAND:

Q.  Did you read these messages?

A.  I did.

Q.  All right.  Did you tamper with them in any
way?

A.  No, ma'am.

Q.  Okay.

MS. COPELAND:  The reason why

that I'm reading them into the record is for the exact reason that Mr. Meisenhelder addressed in his opening. We are showing how severe and pervasive this problem was. This wasn't just a one night that Officer Bowen decided to make a few off-the-cuff remarks with his shiftmates. This was a repeated pattern that went on for a very long time and needs to be put in the record so that the Merit Commission understands just how severe and pervasive this was. I don't know any other way to get them into the record other than to read them to you.

MR. MEISENHELDER: Again, Madam President, I respectfully suggest that Ms. Copeland doesn't have to read them to you, you can read them yourself. And we will stipulate that these are accurate -- accurate copies of what these messages were. And that they were over a series of period of time. But, again, I see no reason that Ms. Copeland needs to read them into the record tonight when we have limited time and the members of the Commission can read them themselves.

MS. MEIER: Response?

MS. COPELAND: Again, this is important for you to hear. I can have Mr. Foster read them to you. This is not something that -- this is something that needs to be brought out, and this is something that needs to be addressed and it needs to be handled publicly because these are public messages that anybody could read.

So I'm certainly not -- I'm happy to ask him specific questions on them, but I do think that we're going to go through these. And out of 5,300 pages, I've only pulled 20.

MS. MEIER: If you would, ask the witness questions about them and have him specify about them. Also, we're not limited on time tonight, so that's not even an issue here. We'll go as long as the evidence determines we need to.

MS. COPELAND: And forgive me, I'll go through -- we'll go through these as quickly as we can.

MS. MEIER: Okay.

MS. COPELAND: But I just think it's too important -- this provides context for the entire reason why we're here. And I

don't intend to do this with any other witness tonight, but it felt inappropriate to not do it with the first witness so you will have context for what my other witnesses are taking about.

MS. MEIER: And maybe call attention to the Commissioners the specific points you want them to focus on.

MS. COPELAND: Sure. Thank you.

BY MS. COPELAND:

Q. Looking at this exchange of communication, the bottom -- the bottom message that's highlighted, what's the date?

A. March 13, 2023, approximately 12:54 hours.

Q. And this is a dialogue between -- who is starting this first conversation?

A. That message that you point out is from Officer Hennig, and it's to Officer Evan Painter, Officer Sam Bowen, and Jacob Hagist, and Brandon Cox.

Q. And if you will read the bottom of the next page, and then we're going to --

A. "Arbys on CL just denied me business. Lol." CL means County Line Road.

Q. And Officer Bowen responded how?

A. "Why."

Q. And Officer Hennig said?

A. "They closed at 11 and all he said is, we closed, in quotes."

Q. And then he went on to say further?

A. "There were two other cars in the driver thru waiting on food."

Q. And Officer Bowen responded?

A. "13 Percenter."

Q. And Officer Hennig said?

A. "He was."

Q. And Bowen responded?

A. "Imagine that."

Q. What's a 13 Percenter?

A. I believe that's --

MR. MEISENHELDER: Objection. Calls for speculation as to what it meant when Officer Bowen used it.

MS. MEIER: Response?

MS. COPELAND: He can certainly testify on what he believes the definition of 13 percent is. And then I'm happy to cross-examine Officer Bowen when he gets up on it.

MS. MEIER: Allowed.

THE WITNESS:  13 Percenter is a reference to 50 percent of the crime in the country is committed by 13 percent of the population, 13 percent of the population being people of African American ancestry.

BY MS. COPELAND:

Q.  So it's a derogatory phrase.  It's commonly used as a derogatory phrase for African Americans.

A.  Yes.

Q.  This highlighted phrase, what's the date?

A.  March 14, 2023, approximately 20:05 hours.

Q.  And who says the highlighted phrase?

A.  Officer Bowen is communicating to Officer Hennig.

Q.  And what does he say?

A.  "This bitch just rolled up on me hot sitting at Goodyear to report her daughter stole a candy bar from Speedway."

Q.  Starting at the bottom line, what's the date of this one?

A.  The -- March 23, 2023, approximately 19:26 hours.  From Officer Bowen to a group chat.

"The fat retard at Popeyes didn't give me my sauce so now I gotta eat my

chicken dry AF."

Q. Which stands for?

A. As fuck.

Q. What does Officer Allen respond?

A. "That's what you get for going to Popeyes."

Q. And, I'm sorry, is it Kintzele?

A. Yes.

Q. What does he respond?

A. "Exactly what I was about to say."

Q. Hennig says?

A. "Awful 13 percent of you."

Q. And Officer Bowen then says?

A. "I was feeling like indulging in what it's like to be a coon for dinner."

Q. And a coon is a derogatory term for who?

A. African Americans.

Q. And keep going, Officer Allen then responds towards the bottom?

A. "Did you get a purple drink with it?"

Q. And Officer Bowen says?

A. "Lol.  No."

Q. And what's derogatory about did you get a purple drink with it?

A. I believe that's reference to grape soda and the connotation is that's what African

Americans drink.

Q. So stereotype, right?  African Americans like chicken and grape soda?

A. Yes, ma'am.

Q. What date is this message?

A. March 27, 2023, at approximately 18:53 hours.

Q. And who says it?

A. Officer Bowen communicating through chat again.

Q. And what does he say?

A. "You guys should be proud of me.  My stop was a car full of retards and I showed great restraint."

Q. Officer Allen started this one.  What is this one?

A. March 27, 2021 [sic], at approximately 18:00 hours.  Officer Allen in a group chat says, "Ole girl was trying to get dicked down."

Q. And Officer Bowen says?

A. "By you?"

Q. Keep going.  What did Officer Bowen say?

A. Where your finger is or at the top?

Q. I'm sorry, at the top.

A. Yeah.  Can you lower it down a little.  Bowen

to a group chat, "a juv?"

Q. So juvenile?

A. Yes, ma'am.

Q. And Officer Allen then says?

A. "Lol, no, by the other teenager."

Q. And Officer Allen is continuing?

A. "She wanted some of the 13 Percent."

Q. And Officer Bowen responds -- or not responds, but he starts -- here is where he starts a new message.

A. Yes, that's to Officer Hagist.

Q. And what do they start saying to each other?

A. Officer Bowen calls Officer Hagist a Jew.

Q. And Hagist responds?

A. "Nazi."

Q. Let's skip to the bottom.

A. Okay.

Q. That's where it starts to get foul. What's the bottom message say?

A. Officer Bowen to Officer Hagist, "Hanukah loving fag."

Q. And the two highlighted on here?

A. Bowen to Officer Hagist says, "gay." And Officer Bowen to Hagist says, "chomosexual."

Q. Again, this one, what's the date of this

message, starting at the top?

A. March 29, 2023, approximately 03:51.

Q. From who?

A. Officer Bowen to a group chat, "This is gay. I'm going inservice."

Q. And Hagist says?

A. "You a hoe."

Q. And Bowen responds?

A. "Jew."

Q. And jump down, Hagist responds?

A. "Nazi."

Q. Bowen says?

A. "Drone expert are we?" And then Hagist responds back, "No, it's common fucking sense."

Q. Bowen says?

A. "No."

Q. Let's jump to the bottom. What's he say at the very end to conclude that?

A. "Common sense you a bitchy Jew."

Q. And this one, what's the date of this one?

A. March 29, 2023, approximately 04:00 hours.

Q. And what is Officer Bowen suggesting his colleague do?

A. "Go violate those homeowners' 4th Amendment

and search their property."

Q. Start at the bottom here.  This shouldn't take very long.

A. March 29, 2023, approximately 4:18 a.m. Officer Bowen calls Officer Hagist a dirty Jew.

Q. Hagist responds?

A. "Nazi."

Q. Bowen says?

A. "Jew."

Q. Bowen says again?

A. "Fag."

Q. And I'm not going to discuss this one because it could take a while.  You can see the banter back and forth and the language that is used.  What's the date of these?

A. April 6, 2023, 4:30 a.m.

Q. And a -- this one, what's the date?

A. April 24, 2023, again, 4:30 in the morning.

Q. And Officer Bowen says?

A. "Is the Jew in this group?"

Q. Allen responds?

A. "Yes."

Q. And Officer Bowen says?

A. "Lazy fucking Jew."

Q. And Hagist says?

A. "TF you want furry?"

Q. Bowen says?

A. "You was up homo?"

Q. And then --

A. "Side note, typical veteran. We give him free money and he can't even keep track of it."

Q. So it's a dis on veterans.

A. Yes, ma'am.

Q. What's the date of this one?

A. May 19, 2023, again, 4:45 in the morning.

Q. And Officer Bowen says?

A. "He's just a drunk Mexican who wants a free ride to Mexico because he misses his family."

Q. And these two I would like to -- we're going to have a little further conversation about. What is Officer Hennig -- what's the date on this one?

A. February 13, 2023, 22:29 hours.

Q. And Officer Hennig says?

A. "Speedway would be a good spot to sit."

Q. Officer Bowen says?

A. "13 Percenter?"

Q. Which -- the common phrase of that is

derogatory towards?

A.  African Americans.

Q.  And Officer Hennig says?

A.  "100 percent."

Q.  In your opinion, could that qualify as racial profiling?

A.  I believe in that they're communicating that to be a specific Speedway gas station at County Line and Madison, which is on the edge of the county line, and wait for an African American to drive by.

Q.  For no other reason than black?

A.  Correct.

Q.  All right, this is the last one.  What's the date of this message?

A.  March 14, 2023, approximately 20:59 hours.

Q.  And Officer Bowen says?

A.  "You."

Q.  And?

A.  Then, "Gay Boy."

Hagist to Officer Bowen, "You."

Hagist to Bowen, "Fag."

Bowen to Hagist, "Queer."

And Bowen to Hagist, "Bet you have rainbow flags up all around your house."

Bowen --

Q. That's where I want to stop you because the next three lines kind of change context. Who is the dialogue between in the next --

A. Those are still between Officer Bowen and Officer Hagist.

Q. What does Officer Bowen say?

A. "This girl next to me at Chick-Fil-A a def susp prior if you want it."

And that means she's definitely suspended prior, which would be a violation of Indiana traffic law. He believes based on her appearance she had to be driving with suspended driving privileges.

Q. Just based on her appearance --

A. Yes.

Q. -- is the assumption at this point?

A. Yes, ma'am.

Q. Bowen then says?

A. "I'll try and get the plate."

Q. And so that means he hasn't actually run the plate?

A. Correct.

Q. And then Officer Bowen says again?

A. "Gold Chevy Malibu I think."

Q.   And he goes on to say?

A.   "Real 13 Percenter."  Then "Percenter"
     again -- or percent.

Q.   Again, there's an African American woman
     sitting next to him and --

A.   So that's why they were choosing to run the
     plate, not because of perceived violation of
     the law.

Q.   What did you do after you read these
     messages?

A.   Again, I was very concerned, because I'm the
     assistant city attorney now, I felt just
     potentially opened the City to civil
     liability based on their conduct.  And, you
     know, I don't want to see the City get sued
     by outside individuals, and I don't want
     to -- again, having been a deputy prosecutor
     for 19 years, to me the worst thing I could
     ever do was actually charge an innocent
     person with a crime.  A thought that actually
     concerned me.  I don't want people going out
     and targeting people just because of the way
     they look.

Q.   Did you give -- did you notify the
     corporation counsel?

A.  Yes, I did.

Q.  Do you know what he did?

A.  I believe he sent the instant messages I obtained to Assistant Chief Fillenwarth.

Q.  You testified earlier that you were a prosecutor.

A.  Yes, ma'am.

Q.  Let's briefly pivot and talk about the possible consequences of a prosecutor with charges, where Officer Bowen is an arresting officer and assisting officer.  What are some possible consequences for criminal cases that are pending?

A.  You have to be thinking in the back of your mind how does this affect my criminal charges.  Am I going to have to change how I handled the case.  I have to think about defending the officers now in their conduct, whether it was good or bad, because of the actions they've taken.  It opens up avenues for the defense to weaken the armor in your case.

Q.  These are all public documents, right?

A.  Yes.

Q.  Could a criminal defense lawyer send a public

records request to the county and also get these messages?

A. Well, they wouldn't have to do a public records request. They can just get it in discovery. The criminal court judge would order it.

Q. And if I represent an African American female that he arrested and pulled something like this, how do I know he wasn't targeting my client?

A. Exactly. Most -- again, the way I always treated infractions is, you're not dealing with bad people. People -- everybody has committed a seatbelt ticket, speeding violation. The only thing you have to go on is the officer's word, his integrity. Because it's a lower standard of proof and it's -- again, you have to be able to believe and trust your officers. If you have conduct like this, that, you know, really challenges their credibility and the judges get -- consider that. And it can be a good cause to suppress a stop.

And in most bigger criminal cases when they come from the road, they come from