officers being proactive and making stops for bad plates or infractions they perceive. But if you have a minority defendant, and the only reason is like, oh, you're pulling him over for a fogged-over license plate or they went left of center but I can't really see that on the body cam, that's -- that severely weakens your case.

Q. And to be fair, Officer Bowen's arrest could be completely valid and within the confines of the law, correct?

A. Correct.

Q. But this now calls into question all of that --

A. Yes, ma'am.

Q. -- would you say, is that fair?

A. Yes.

MS. COPELAND: I have no other questions for this witness.

MS. MEIER: Cross?

EXAMINATION BY MR. MEISENHELDER:

Q. Mr. Foster, prior to the time that you gave these instant messages to Deputy Chief Fillenwarth, did you talk to anyone else about them?

A. I did not give them to Deputy -- or Assistant Chief Fillenwarth. I gave them to my supervisor to forward them to them. But the only people I spoke to about them would be corporation counsel and the other assistant city attorneys.

Q. When did you give those instant messages to the police department?

A. I -- I don't have the answer to that question. I gave them to my -- to Mr. Hodson, either on the 14th or 15th. I do not know when he forwarded them to Assistant Chief Fillenwarth.

Q. Could you explain to me what a group chat is?

A. Group chat is kind of like a group text, you're not just communicating to one person. You enter the user names for the other people in the group and you all have a group conversation where you all receive the messages in one chain. Usually on Spillman -- the Spillman system.

The format we have it in, is just everything he sent and received. He would be a separate bubble that appears with that specific group chat. Probably Officer

Fillenwarth or Ison can explain that better.
I only used it some in the prosecutor's
office.  But it would be a group chat between
Officer Bowen and the others in the group.

Q. Does the group chat, is that something you
set up in advance or do you do that
individually for each chat, or how does that
work?

A. I do not -- I know from when I used Spillman,
and it's been several years, I infrequently
used it, you would just click on the
individual I would want to send a message to.
I am not 100 percent sure how you would set
up a group chat.  That would probably be a
better question for Officer Fillenwarth or
Ison.

Q. When you were talking about the woman at
Chick-fil-A, do you have any idea what was
going on at the Chick-fil-A other than the
fact that Officer Bowen was there and this
woman was there?

A. What do you mean?

Q. Do you know if Officer Bowen might have heard
something that suggested to him this woman
had suspected priors?

A. I do not know.

Q. So when you say that his decision to run her plates was based only on the fact that she was African American, you don't really know that, do you?

A. I don't.

MR. MEISENHELDER: Thank you. I have no further questions.

MS. MEIER: Redirect?

MS. COPELAND: No, thank you.

MS. MEIER: Next witness?

MS. COPELAND: Assistant Chief Fillenwarth.

MR. FOSTER: Does the Board want to ask any questions?

MS. MEIER: Oh, I'm sorry. The Commissioners have questions. I'm sorry.

MR. BROGAN: You stopped in mid May. Did you do anything else after May? At least there's no other additional papers.

THE WITNESS: The total 5,300 pages goes from July 2023 to July 2021.

MR. BROGAN: Okay.

THE WITNESS: There were terms I found offensive all through that time period.

I believe Counsel will present what she deems appropriate.

MS. MEIER: Any other questions?

MR. SHERMAN: Yes, I have a question.

What would the prosecutor's office have to do in the future; if Officer Bowen made an arrest, would there be additional burden on --

THE WITNESS: Well, under the Supreme Court case called Giglio, which is -- involves when you have incidents of officer dishonesty. And this type behavior I believe comes down to integrity, whether you can believe them or not, so it involves honesty. The prosecutor's office has an affirmative duty to let every criminal defense attorney, every criminal defendant know that these allegations are out there.

I don't know what decision they have made. I do know -- they may be waiting on resolution of this. I believe they have sent off letters that there are possible Giglio-type evidence on these officers. And they are -- they have to resolve that through

discovery and provide these IMs to those individuals, to those defense attorneys.

MR. SHERMAN:  Thank you.

MS. MEIER:  Questions on the members' questions?

MR. MEISENHELDER:  No questions.

MS. COPELAND:  No, thank you.

MS. MEIER:  Next witness?

MS. COPELAND:  Chief Fillenwarth.

(Witness sworn.)

EXAMINATION BY MS. COPELAND:

Q.  Can you please state your name for the record.

A.  Matthew Fillenwarth.

Q.  Where do you currently work?

A.  Greenwood Police Department.

Q.  In what capacity?

A.  I'm the Assistant Police Chief.

Q.  How long have you been a police chief?

A.  Approximately 12 years.

Q.  How long have you been a police officer?

A.  Little over 30.

Q.  Do you know Officer Bowen?

A.  Yes, I do.

Q.  What kind of an officer has he been for

Greenwood?

A. Fine.

Q. He's a fairly new cop, is that fair to say?

A. Yes.

Q. But he wasn't much of a disciplinary issue prior to this, right?

A. No, not to my knowledge.

Q. So prior to this investigation, would you have considered him to be a good active officer?

A. Yes, I would.

Q. How did you learn about the IMs?

A. I was contacted on the phone by the deputy mayor.

Q. Do you recall about when that was?

A. It was in the afternoon, on a Friday, late. Probably 3 o'clock, maybe.

Q. What happened next, what did you do after you learned of this?

A. He asked me to come to his office. I did so.

Q. And what did he tell you, or what happened there?

A. I was informed that these IMs were submitted, requested through the lawsuit, and that they had been made aware of contents of the IMs.

Q. And I was there -- they were informing me what the contents of the IMs were.

Q. Did you speak with the chief on this issue?

A. Yes, I did.

Q. Do you recall when you told the chief?

A. Later that evening.

Q. Did the chief instruct you to perform an investigation?

A. Yes, he did.

Q. As part of that, did you read the instant messages?

A. Yes, I did.

Q. What was your reaction to them?

A. I was shocked.

Q. Did you interview Officer Bowen?

A. Yes, I did.

Q. Do you recall when you did that?

A. Not the exact date, no.

Q. If I tell you August 2nd, do you have any reason to disagree?

A. No, I don't.

Q. At any point in that investigation -- sorry, at any point during that interview did he deny saying the things that are in the instant messages?

A. No, he didn't.

Q. Did he claim the department manufactured them?

A. No, he didn't.

Q. Or Johnson County had manufactured them?

A. No, he didn't.

Q. Did he argue with you that they were wrong?

A. No, he didn't.

Q. Did he attempt to explain that they were taken out of context?

A. No.

Q. How did he appear to you during the interview?

A. Relaxed.

Q. Was he remorseful?  Embarrassed?

A. Yeah, maybe a little of each.

Q. What did -- what did he say about them?

A. Other than, you know, being questioned and saying he did type that or, you know.  I do believe on one of those IMs he said that is certainly something I would not be proud of. But that's all I remember as far as that context.

Q. Did he -- what definition did he give you for a 13 Percenter, do you recall?

A. Initially -- actually, all of them were kind of, well, that's apparently 13 percent of the population is responsible for 50 percent of the crime, and that's kind of the generic answer I got from everybody involved.

Q. So he made it sound like it wasn't an issue of being Black, it's just criminal, period.

A. Not initially, no.

Q. Did he later state that 13 Percenter does, in fact, refer to Black people?

A. Yes, he did.

Q. Did you make a recommendation to Chief Ison how to handle this, how to handle -- like what discipline he should receive?

A. My opinion of it, after the investigation, termination was the proper way to go.

Q. Do you stand by that today?

A. Yes, I do.

MS. COPELAND:  I have no further questions.

MS. MEIER:  Cross?

EXAMINATION BY MR. MEISENHELDER:

Q. Chief Fillenwarth, let me ask you a couple questions that I asked Mr. Foster.  Can you explain how instant messaging works on the

MDCs?

A. I'm not sure I follow your question as far as what you're asking.

Q. Let me rephrase it. Is -- Mr. Foster said that group messaging is similar to group texting on a phone. Is it something that you have to individually put each person's name in for every text, or can you just set up a group in advance and just say I'm going to send a message to this group?

A. And when you refer to "this", you're talking about this Spillman instant messaging system?

Q. Yeah.

A. It's not something I'm that versed in. My understanding of it is that, yes, you can instant message anyone in the county that is currently signed on. And my understanding of it is that you can also do custom groups, you know, and hit that.

Q. But if you set up a group message, anybody who is in that group would receive that message, correct?

A. I'm not an IT guy, but I -- I would assume so, yes.

Q. Let me back up. You said you've been a

police officer for about 30 years.  Have mobile data computers been a standard part of a police officer's equipment that entire time?

A.  Not in my career, no.

Q.  In your experience as a police officer, have you ever heard other police officers say inappropriate things to one another?

A.  Sure.  I suppose so.

Q.  Have you ever said something either on the radio or on an MDC or in person to another police officer that was inappropriate, looking back on it?

A.  There's three questions there.  So I'd say no, I've never said inappropriate things on the radio or the computer.  I'm sure I've said inappropriate things to my colleagues in socializing, so...

Q.  Now, what would your expectation be if someone in the police officer's chain of command was aware that Officer Bowen and the other police officers were engaged in this kind of communication?  What would you expect that person to do?

A.  I'm not sure I followed your question, sir.

Q. Wouldn't a higher ranking police officer or supervisor of a police officer who was aware of this kind of communication, wouldn't you expect him to address that issue with the officers that were making communications?

A. So, yes, if there was a supervisor that was aware this kind of activity was going on, absolutely, I'd expect him to address it.

Q. And would a sergeant be a supervisory police officer?

A. Yes.

Q. And wasn't Brandon Cox a recipient of many of these group messages that Ms. Copeland read to us at such length?

MS. COPELAND:  I'll actually object.  He's not on any of these.

But you can go ahead and answer.

A. My answer to that is, I don't know.  I didn't see that.

MS. COPELAND:  He was not in the room.  He wasn't in the room for any of these messages.  He doesn't know what messages were introduced.

BY MR. MEISENHELDER:

Q. Okay.  Would you agree that if Brandon Cox

was in the group message, that he would have -- he would have seen what the messages said? He would have received them, is that right?

A. I believe that if Sergeant Cox knew this was going on, he would have addressed it with his officers.

Q. With respect, Chief Fillenwarth, that wasn't my question. My question was, if he was a designated recipient of a group message, he would have received that, is that correct?

A. What do you mean by received?

Q. It would have come across his computer.

A. I'm going to assume that if he was texted or IM'd, that it would have come on his CAD, yes.

Q. And at the time many of these messages were sent, isn't it true that Brandon Cox was a sergeant?

A. I -- I don't know if he was their sergeant the entire time.

Q. Well, let me rephrase the question. Brandon Cox is a sergeant on the police department now, right?

A. Yes.

Q. And when did he become a sergeant?

A. I don't know.

MR. MEISENHELDER:  Thank you.  I have no further questions.

MS. MEIER:  Redirect?

MS. COPELAND:  I have a few.

EXAMINATION BY MS. COPELAND:

Q. Chief Fillenwarth, have you ever called someone a coon on instant message?

A. No.

Q. Have you used the phrase Jew, bitchy Jew, dirty Jew, 57 times on your instant messages?

A. No.

Q. Have you said fag, faggot or queer 77 times on your instant messages?

A. No.

Q. If Sergeant Cox has said fag, faggot or queer 77 times, should the department investigate that?

A. Absolutely.

Q. If he had said Jew, dirty Jew, or bitchy Jew 57 times, should the department investigate that?

A. Yes.

Q. Okay.  Coon, 13 percent, the department

should investigate that, correct?

A.  Absolutely, yes.

MS. COPELAND:  I have nothing
else.

MS. MEIER:  Re-cross?

EXAMINATION BY MR. MEISENHELDER:

Q.  To the best of your knowledge, other than the
six officers, including Officer Bowen, that
were recommended for some sort of discipline
as a result of these, has the department ever
looked into any other officers for improper
use of their instant messaging?

A.  In this case?

Q.  At all.

A.  What's your reference?  Because we have
looked into officers' behavior and IM traffic
in the past.

Q.  When was that?

A.  I don't recall the specific year, but it's
been some time.

Q.  Do you recall if anyone has ever been
terminated for improper message -- messaging
of the nature that Ms. Copeland was just
asking you about?

A.  I can't remember a time in my career that

I've seen instant messaging used like this to such a degree. So my answer would be no.

Q. Now, Ms. Copeland asked you if you've ever used any of those terms in instant message. Have you ever used any of those terms or anything similar to that in private conversation with other police officers?

MS. COPELAND: I'll object. This has absolutely nothing to do with private conversations that even Officer Bowen was having with other people. This was all done on public documents in a public forum. He should not have to answer what he does in his private capacity.

MS. MEIER: Yeah, if you could just limit it to Officer Bowen and his behavior that's at review here.

BY MR. MEISENHELDER:

Q. Other than Officer Bowen's communications, were you given any other instant messaging traffic that was not derived from Officer Bowen's communications?

A. Are you asking me was there other officers' communications involved in this case? We had like 5,000-plus pages of -- of instant

messages.

Q. For example, did you, when you saw that Jacob Hagist was involved in these communications with Officer Bowen, did you get the rest of Aaron [sic] Hagist's communications with other officers?

A. Are you talking about Deputy Chief Hagist or --

Q. No, Jacob.

A. Okay, because you just said Aaron.

Q. I'm sorry. I meant Jacob.

A. I'm sorry, sir, what was the question again.

Q. Once you found out that Jacob Hagist was involved in these kinds of communications with Officer Bowen, did you go out and check Officer Hagist's communications with other officers?

A. Sir, I didn't pull any chat --

Q. I understand.

A. I did not -- I investigated this case based on the chat logs that were provided to us. I didn't go request any kind of communications.

Q. But wouldn't you agree that if you found out that an officer was engaged in this kind of communication with Officer Bowen, it would be

important to know if he was engaged in that kind of communication with other officers?

A. Officer Hagist was investigated as part of this.

Q. What I'm asking is, did you get any of Officer Hagist's IMs to anyone other than Officer Bowen?

A. So there was other communications involved in this I believe from Officer Hagist to other officers. They were questioned on the parts that we felt were inappropriate. So I guess to answer the question, yeah, I think there were some communications in there from him to other officers.

Q. Okay.

A. Is that what you're asking me?

Q. That will do for now. Let me see if I can make this a little clearer. Other than the instant messages that the city attorney provided you, did you get any other -- did you receive any other instant messages from Officer Hagist, Officer Hennig, or any of the other officers that were involved in this? Or were they all communications basically involving Officer Bowen?

A. I'm not really sure how to answer that question. I was given information by the chief and asked to conduct -- conduct interviews and investigation based on that material. It's my understanding that product was provided by the city attorney. Again, I did not make any requests myself for any of this.

Q. Speaking of the chief, what specifically did the chief tell you to do?

A. Interview the officers involved.

Q. Did he -- did he tell you that he wanted you to find out how big a problem this was? It's a yes or no question, Chief.

A. No, it's not a yes or no question. I'll answer the question, and my answer is that the chief asked me to investigate, gave me the material, and that is what I did.

Q. Did he tell you that you were you not supposed to go beyond that material?

A. We had no discussion as far as that is concerned.

MR. MEISENHELDER: I have no further questions for this witness.

MS. MEIER: Redirect?

MS. COPELAND: I'll try to make this real simple.

EXAMINATION BY MS. COPELAND:

Q. The chief told you to conduct interviews, correct?

A. That's correct.

Q. That's it.

A. Yes.

Q. Okay. You read the instant messages to get context, correct?

A. Yes.

Q. And then the chief completed the investigation, is that correct?

A. Yes.

MS. COPELAND: Nothing else.

MR. MEISENHELDER: Nothing further.

MS. MEIER: Do the Commissioners have any questions?

MS. TRIETSCH: I do.

Assistant Chief, can you tell me why you're recommending termination for Officer Bowen?

THE WITNESS: So when you look at those text messages, any attorney in the

future could take that out of context. So if I'm one of these groups, or personally in one of these groups that they are disparaging in these text messages -- and this is a public hearing and that will be forever out there. If I'm Jewish, a person of color, LBGTQ [sic], whatever, and I'm arrested by one of these officers, I'm always going to feel like did I get a fair shake from my police department, from this officer. They can say that they weren't serious about the context of those. The problem is, it's there, it's in the record. It'll always be there.

So how do I, as a member of this community, trust that they're giving me or they're giving other members of my family -- maybe I have a relative that's gay or disabled or of color, how do I have -- for us, when I know about this, how do I trust that what they're doing is fair and unbiased? And by putting that stuff down there, any attorney can go, oh, you can say you're fair and unbiased, but look what you put.

So I -- number one, to me, it's a community trust as far as our community has

to trust us and believe in us or we're ineffective as a police department. We can never do this by ourselves. We have to have community trust.

And to me, that violates the community trust. There's going to be that doubt. If I'm one of those groups, there's always going to be that doubt. And to me, you can't be an effective police department in this agency.

Does that make sense?

MS. MEIER: Thank you.

Any other questions?

MR. BROGAN: I have one.

Does the department have the ability to -- to check, see if there's a pattern or if there's been any followup with or any connections with the number of people that might fall under a category that was slammed by the defendant? Can you go back and check who was arrested or ticketed or stopped --

A. Yes.

Q. Has anybody done anything like that?

A. That probably would be a better question for the chief.

Q. Okay.

A. We have been -- we have been looking into this, yes.

MS. MEIER: Anything else? Questions? Any questions on the Commission's questions?

MR. MEISENHELDER: No.

MS. COPELAND: No, thank you.

MS. MEIER: Call your next witness.

MS. COPELAND: Chief Ison.

MS. MEIER: Well, first of all, does anyone need to take a break yet?

MS. COPELAND: I'm good.

MS. MEIER: All right. Go ahead.

(Witness sworn.)

EXAMINATION BY MS. COPELAND:

Q. Can you please state your name for the record.

A. James Ison.

Q. Where do you currently work?

A. Greenwood Police Department.

Q. In what capacity?

A. Chief of Police.

Q. How long have you been the police chief for

Greenwood?

A. A little over three years.

Q. How long have you been a police officer for Greenwood?

A. 23 years.

Q. Did you hire Officer Bowen?

A. I did.

Q. Do you recall about when?

A. I believe it was October of 2020.

Q. I assume he passed all the required testing and training at ILEA?

A. Yes, ma'am.

Q. There were no red flags?

A. No.

Q. He's been in patrol for roughly three years?

A. Yes.

Q. What kind of an officer has he been?

A. Very productive.

Q. Not much of a disciplinary problem?

A. Not really much of anything until the beginning of this year, and I recall, I think he was written up by a supervisor for not wanting to stay over when he was requested to do so as an FTO.  But overall, productive officer.

Q. How did you learn of these instant messages?

A. I was called -- the day that the assistant chief got the call, I was at the FBI headquarters. You can't take cell phones into the FBI headquarters, so I missed the call from the deputy mayor. The deputy mayor called the assistant chief and asked him to come over. I believe that was July the 14th.

When I returned to my vehicle, I saw the missed call from the deputy mayor. So I called the deputy mayor, he said I've already talked to the assistant chief, please come to my office and meet with me and corporation counsel Monday morning, which would have been the 17th. When I got to his office, he presented the 5,320-page document. And I started going through it, and he was pointing out some of the language that was used.

Q. Did you know that the legal department had requested these from the county?

A. No idea. No, I did not.

Q. Do you know that that's something lawyers do --

A. Yes.

Q. -- in a civil lawsuit?

A.  Yes.

Q.  Or it could be done in a criminal case, for that matter.

A.  Yes.

Q.  What was your reaction when you read the instant messages?

A.  I was shocked, and I think the thing that hit me the hardest was that I knew that we would have to be transparent with the public because that's what we do, and the disrepute it would bring upon our agency.  I wanted to throw up.

Q.  Before this time, again, this is an officer that you thought he was a good active officer on the department.

A.  Yes, ma'am.

Q.  Did this question that?

A.  Yes.

Q.  What did you do after you learned of these instant messages?

A.  I took about 10 days, I believe -- I believe it was right at 10 days to go through the instant messages.  Like I said, it was 5,320 pages, so what I did was keyword searches, PDF, Adobe Acrobat, on 13 Percenter, Jew, and

some of the other pejorative comments that were made or words that were used.

And it was so overwhelming, it was like where do you begin because there was so much of it. I then immediately started thinking, and this goes to the questions that his attorney was asking the assistant chief, my concern was, okay, we know that there's five officers on one shift, is this systemic throughout our agency. That was my biggest concern at the time. So I did pull the other officers' involved IMs. I requested them myself from Johnson County Communications Center.

What I found was that the majority of these comments were made in the group chats and they coincided with the -- the document that was Mr. Bowen's 5,320-page document. I also selected two officers randomly from each shift and requested their IMs from the same time period because I wanted to see. I did keyword searches using the same words and there was nothing. So I was fairly confident that this was isolated to one night shift.

Q. What policies do you contend that Officer

Bowen violated?

A. Our information technology policy, mobile data terminal policy, and our standards of conduct policy.

Q. I'm going to go ahead and hand you Exhibit 6, 7, and 8.

(Whereupon, Exhibits 6, 7, and 8 were introduced.)

BY MS. COPELAND:

Q. Can you identify these documents, please.

A. Yes, it's Policy 321 Information Technology Use; Policy 422 Mobile Data Center Use; and Policy 320 Standards of Conduct.

Q. And just so the record is clear, Policy 321 is Exhibit 6, correct?

A. Yes.

Q. 422 is Exhibit 7?

A. Yes.

Q. And 320 is Exhibit 8?

A. Yes.

MS. COPELAND:  I would move to introduce these.

MR. MEISENHELDER:  No objection.

MS. MEIER:  So moved.

BY MS. COPELAND:

Q. Focusing first on Exhibit 6, 321, why do you believe that Officer Bowen violated information technology use?

A. Specifically 321.2, "It is the policy of the Greenwood Police Department that members shall use information technology resources, including computers, software and systems, that are issued or maintained by the agency in a professional manner and in accordance with this policy."  This was obviously not used in a professional manner.

Q. Okay.  Exhibit 7, Policy 422, Mobile Data Center Use.  What do you believe that he violated on this one?

A. Specifically 422.4, restricted access and use.  "Sending derogatory, defamatory, obscene, disrespectful, sexually suggestive, harassing, or any other inappropriate messages on the MDC system is prohibited and may result in discipline."

Q. And MDC stands for?

A. Mobile data computer.

Q. Otherwise known as laptop?

A. Yes.

Q. And 320, standards of conduct, I believe we

have to turn to page 6.

A. Yeah. 320.5.9, under conduct, subsection H, "Use of obscene, indecent, profane or derogatory language while on duty or in uniform."

Q. And you believe that -- you've been present this entire time, correct?

A. Yes.

Q. For the messages that we've introduced?

A. Yes.

Q. And that his messages constitute obscene, indecent, profane, and derogatory language?

A. Yes.

Q. Do we know that he was on duty?

A. Yes.

Q. In uniform?

A. Yes.

Q. Driving his patrol car?

A. Yes.

Q. I'll hand you Exhibit 9.

(Whereupon, Exhibit 9 was introduced.)

BY MS. COPELAND:

Q. Can you identify this document, please.

A. This is the official disciplinary charging

document that I sent to the Merit Commission.

Q. And it may be redundant, but what did you include in this document?

A. I'm sorry, I didn't hear you.

Q. I'm sorry. I said it may be redundant, but what did -- what is this document, what did you include in this document?

A. An explanation of what led to the charges, what the investigation found, and a list of the specific charges that we just discussed.

MS. COPELAND: Move to introduce and publish.

MR. MEISENHELDER: No objection.

MS. MEIER: Admitted.

BY MS. COPELAND:

Q. So page 1 is highlighted facts, is that fair?

A. Yes.

Q. Page 2, what do you start to identify on page 2?

A. These were the -- what I referred to as the keywords that were searched, that were used most often, and that I felt were very pejorative, used pejoratively, such as 13 Percenter, Jew, fag, faggot.

Q. Let's go back to page 1 for just a second.

Q. Third paragraph down, how many times did he say 13 Percenter?

A. 16.

Q. And Jew?

A. 57 times.

Q. Fag, faggot or queer?

A. 77 times.

Q. Did you even count how many times he said bitch, slut, cunt or fuck?

A. I did not.

Q. Because it was --

A. A lot.

Q. -- a lot?  Why are you recommending termination?

A. Because of the quantity and severity of the pervasive statements made.  They not only violate the policies of our department, but our core values.  They bring disrepute upon all 70 of our officers that had nothing to do with this.  And quite honestly, it jeopardizes Mr. Bowen's ability and credibility to testify going forward in future cases.

Q. Do you have officers on this department who are African American?

A. Yes.

Q. Do you have any officers on this department who are homosexual?

A. Yes.

Q. Do you have any female officers on this department?

A. Yes.

Q. So you have officers that fall under these protected classes?

A. Yes.

Q. You saw the messages I published earlier under Exhibit 5. Can you say definitively this officer was not racial profiling?

A. No.

Q. Was your recommendation for his termination based solely on the language in these instant messages?

A. Yes.

Q. Did your recommendation have anything to do with the events that happened in the spring of this year?

A. No.

Q. Can you explain what did happen in the spring of this year?

A. There was a very contentious mayoral

election, and during that time officers -- it was right around February where it started becoming brought to my attention that officers were violating our social media policy. And I -- I will say that I'm very lenient when it comes to enforcing that policy, but over the course of several months Officer Bowen posted several false accusations that I was lying, that other city officials were lying, and quite honestly, airing grievances, department grievances and his grievances, over the use of social media, which violated our social media policy.

Initially, I was choosing to just ignore it. However, as it continued and went on -- well, I also sent an e-mail to the entire department, I believe it was in early February when this started, reminding them that we have a social media policy. I attached the policy to the e-mail and requested that everyone read that and stay within the guidelines because I could see the problem arising.

Later in the spring, at a Commission meeting, President Trietsch asked me about

these social media posts that she was seeing, and asked why I was allowing it to continue and not addressing it. I told her at the time that I felt that I was going to take the higher road, and that I also felt that quite honestly that Officer Bowen was -- I did not want to give the impression by issuing discipline prior to the election that I was punishing officers for supporting a candidate.

The Commissioner advised me that -- just reminded me that they could take action on their own, and I believe we discussed precedents that this would create if I didn't do anything about it, and in case, you know, there were future circumstances or incidents like this, and it also -- I was also approached by other members of the department that asked me the same question, why are you allowing, this is embarrassing, this is harmful to our department. And what are you going to do, you know, in the future if you don't take action and enforce this policy. And you're setting a precedent that we might as well not even have this policy.

Q.  Did you do something in response to the false messages that he was providing?

A.  Yes.  I -- so like I said, I thought long and hard about how I wanted to handle this, and I did not want it to appear that we -- that I or the department or the city was out to get or punish any officer for supporting a political candidate.  So I wanted to wait until election night.  And I did wait until election night, I called Officer Bowen in, and because he was undermining the office of the chief of police, the punishment -- or the discipline that I issued was revoking privileges that he gets through my office, which are his take-home vehicle and the ability to work off duty employment using his sworn powers, his -- and his equipment issued and uniform issued to him by the police department.

Q.  He filed a federal lawsuit?

A.  He did.

Q.  That's playing itself out?

A.  Yes.

Q.  So whether or not there's any substantiation there or not is still left to remain,

correct?

A.   Correct.

Q.   If he testifies today that the only reason he's facing termination is because he filed a lawsuit against you, is there any truth to that?

A.   No.

Q.   Were you mad at him and the things that he was saying so that's why you are recommending his termination?

A.   No.

Q.   Was Officer Bowen the only officer who was disciplined as a result of these instant messages?

A.   No.

Q.   How many were there?

A.   There were two.

Q.   That were disciplined?

A.   Oh.  Instant messages --

Q.   In these instant messages?

A.   Okay, no, I'm sorry, there were six.  I thought -- I was still on the social media posts.

Q.   And what's the current status of the other five?

A. Three have resigned, two are -- well, Mr. Bowen and another individual are facing disciplinary hearings as we are here tonight. And the sixth individual was given five days suspension.

Q. Why only five days?

A. The content and quantity, I believe there were just four or five messages over this entire period of time in which he had -- he had called his shiftmates in what is probably banter, fags. He was not talking about the public, referring to the public. It's not appropriate, but it did not rise to the severity and the quantity of the other officers.

(Whereupon, Exhibit 10 was introduced.)

BY MS. COPELAND:

Q. If Officer Bowen testifies that these messages were private, these were just boys being boys, locker room talk, banter, never expected anyone to see them, do you buy that?

A. No.

Q. I just handed you what I've marked as Exhibit 10.

MS. COPELAND:  These are more instant messages that were exchanged between the officers.  I would move to introduce and publish.  These are very brief.

MR. MEISENHELDER:  No objection.

MS. MEIER:  So moved.

BY MS. COPELAND:

Q.  Okay.  The first message that is highlighted, can you give me the date, please.

A.  4/15/23.

Q.  Okay.  And Officer Hagist starts this, what I've highlighted, is that correct?

A.  No, this was --

Q.  What I've highlighted.

A.  Okay, yes.  Yes.

Q.  Okay.  What does Officer Hagist say?

A.  "Go fuck off.  Let me finish this so I can watch a movie."

Q.  And Officer Bowen -- and these are just messages between these two specifically, correct?

A.  Yes.

Q.  And Officer Bowen responds?

A.  "No movies."

Q.  Hagist says?

A.   "Don't you bitches have business shit to do."

Q.   And Bowen says?

A.   "I'll write you up for misuse of your computer."

Q.   Bowen goes on to say?

A.   "Calling Wehnert R-N."

Q.   Which is right now?

A.   Yes, I assume.

Q.   And Bowen says?

A.   "Enjoy your suspension."

Q.   We'll stop there with this one.  So based on this, "I'll write you up for misuse of your computer", is that exactly what you're accusing -- that's exactly what you're alleging he violated?

A.   Yes.

Q.   They knew they were violating the policy.

A.   Yes.

Q.   Let's turn to the next page.  We're not going to discuss the first part because it's gross.  If you go to where I am pointing, what does Officer Bowen say?

A.   "I hope admin reads your IMs."

Q.   And then he says?

A.   "And realizes how gay you are."

Q. And Hagist says?

A. "You would be fucked too."

Q. So again, they knew it.

A. Yes.

Q. Right, that was the impression that you get from these messages, they knew what they were doing was wrong and they continued to do it?

A. Yes.

Q. You heard my questions to Assistant Chief Foster [sic], correct?

A. Assistant Chief Fillenwarth?

Q. I'm sorry. Assistant City Attorney Foster?

A. Yes.

Q. Do you also believe that Bowen is now a liability on this department?

A. Yes.

Q. Simply because he chose to use racist and inflammatory language in public records?

A. Yes.

Q. If the Commission does not affirm your recommendation to terminate and he gets to remain a police officer, how does that affect your department?

A. Well, I don't know what I would do with him because as long as I'm the chief I would

never put him back in a role where he's going to interact with the public. I think that would be a liability for the city and for our agency, and it would be an injustice to the citizens we serve. So I don't know what I would do with him.

MS. COPELAND: I have no other questions.

MS. MEIER: Cross?

EXAMINATION BY MR. MEISENHELDER:

Q. Chief Ison, would you take a look at what you were given as Exhibit 9 by Ms. Copeland, please.

A. Yes.

Q. It says that on July 17, 2023, you were summoned to a meeting with the deputy mayor and Attorney Samuel Hodson, is that correct?

A. Yes.

Q. So you -- that's when you first learned about these instant messages?

A. That's when -- well, I first learned about them was when I called the deputy mayor back on the Friday before. He didn't go into detail, he gave a brief description and said we'll talk Monday morning in my -- or be in

Sam's office at, I believe, 9:00 a.m.  And that's when he presented the documents to me.

Q. All right.  So when you had this meeting, you were aware that they had retrieved all these messages as a result of Officer Bowen filing a lawsuit, correct?

A. Yes, I was made aware that they did that on the 14th when I returned his call.

Q. But you already knew about the lawsuit, right?

A. Yes.

Q. You received an e-mail from the city attorney on July the 12th saying that you needed to preserve evidence?

A. Yes.

Q. You received a letter from the outside law firm that apparently Ms. Copeland works for on the 14th, and it referred to the fact that you were named specifically in this lawsuit --

A. No, that's not -- that's not correct.  I received a letter from the law firm that was -- is representing us in the civil case, not the disciplinary hearing.  Ms. Copeland is working for Taft.

Q. My mistake. So you did receive a letter from the law firm that is handling the civil case for the City.

A. Yes.

Q. And it mentioned the fact that you specifically were one of the defendants?

A. Yes.

Q. And you were aware that Officer Bowen was alleging that you had retaliated against him for social media posts that he'd made.

A. I believe that was -- I believe I was made aware from your letter. I think I received that first.

Q. Okay. I'll show you what I've marked as Exhibit D.

(Whereupon, Exhibit D was introduced.)

BY MR. MEISENHELDER:

Q. Do you recognize those?

A. I do not recognize these.

Q. If you look at the first page, it's posts by Sam Bowen.

A. Yeah, I don't think I've ever seen these.

Q. So did you see any of the posts that you say Officer Bowen was making that were --

A.    Yes.  Yeah, but it wasn't these.

Q.    Okay.  In any of those posts, did Officer Bowen identify himself as a Greenwood police officer?

MS. COPELAND:  I'm going to object to this line of questioning because it's entirely irrelevant for purposes of this Merit Board hearing.

MR. MEISENHELDER:  With respect --

MS. COPELAND:  I didn't get to finish my objection.

MR. MEISENHELDER:  I apologize.

MS. COPELAND:  We've addressed the fact, and included in the charging form, this has only to do with the instant messages.  He is not denying the fact that the instant messages were obtained as a result of the lawsuit.  But getting into the merits of what happened in the spring is entirely outside the scope of this particular disciplinary hearing.

And the posts that were said or not said, if the chief violated his First Amendment right, he will be paid out in his

federal lawsuit for that. That is separate and apart from this entirely.

MS. MEIER: What is the relevance, sir?

MR. MEISENHELDER: The relevance goes to Chief Ison's bias in recommending the disciplinary charges and recommending Officer Bowen for termination. The evidence suggests that Chief Ison was angry and upset with Officer Bowen because Officer Bowen was calling into question whether the chief was being transparent with the public about public safety matters. And that -- and the chief was in effect doing this specifically to support the mayor.

Now, we contend in the civil lawsuit that's a violation of Officer Bowen's First Amendment rights. But that's not why we're talking about it here. We're talking about the fact that Chief Ison was -- and he admits that he was retaliating against Officer Bowen --

MS. COPELAND: I will object to that.

MR. MEISENHELDER: I'll withdraw

the word retaliating.

MS. MEIER: Well, I don't believe there's been any admission of retaliation.

MR. MEISENHELDER: I'll withdraw that word. That he took his actions on primary night because of the texts that Officer Bowen wrote.

In order to understand that he was biased against Officer Bowen, we have to talk about it. The fact that -- when he says Officer Bowen was publishing false messages, false posts on social media, that's Chief Ison disagreeing with what Officer Bowen, in fact, said, which was that he wasn't being transparent. What -- in effect, Officer Bowen was challenging Chief Ison's political involvement in the election, as he has a right to do. That made Chief Ison mad. And when he saw the instant messages, he was determined to use those to get rid of Officer Bowen.

MS. MEIER: Sir, I don't believe there's been any testimony whatsoever that these other instant messages have anything to do with the discipline before the Commission

tonight. The discipline before the Commission has to do with the evidence that's been so far that derogatory terms were used and how it violates department policy. There's nothing that is before this Commission that his request for termination has to do with anything about the election or false instant messages prior to what was discovered after the lawsuit.

And so if you could just focus on the charges before the Commission for termination, I believe the lawsuit, you'll have your day in court for that later on.

BY MR. MEISENHELDER:

Q. Let me ask you this, Chief Ison. Have you ever terminated any other officer for violating Policy 422?

A. Yes.

Q. Tell me about that, please.

A. I submitted a -- I submitted charging information to the mayor and Commission. I don't know that I want to use the officer's name because he has resigned, but an officer committed a criminal offense and this policy was violated, and the officer resigned before

his hearing.

Q. You said the officer committed a criminal offense?

A. Criminal offense.

Q. Okay. Any other examples where the officer did not commit a criminal offense?

A. Not that I can recall.

Q. What about Policy 321?

A. I don't believe I've issued any discipline that I can recall for either Policy 321 or Policy 422 in my tenure as chief.

Q. Finally, what about Policy number 320?

A. Yes, standard of conduct?

Q. Yes. I'm sorry. Have you ever disciplined any officer for violating that policy?

A. Yes, several. And I believe, as a matter of fact, I suspended Officer Bowen and several other officers, nightshift officers, back in July for a violation of this policy.

Q. That was the incident where you were informed that officers had been urinating behind a dumpster at a local business, is that right?

A. Correct. A dumpster that was videotaped.

Q. How many officers did you discipline in that case?