A.   I believe 21.

Q.   And the discipline that you gave them for that was a one-day suspension, correct?

A.   Correct.

Q.   Other than that, have you ever disciplined any officer for violating Policy 320?

A.   Yes.  I don't recall all -- this is a common -- a common policy that's cited.

Q.   Do you know an Officer Eck?

A.   Yes.

Q.   Did you ever discipline him for violating Policy 320?

A.   I'd have to look at my records.  I don't remember.

          MR. MEISENHELDER:  If I could have a second, Madam President.

          (Whereupon, Exhibit H was introduced.)

BY MR. MEISENHELDER:

Q.   I'm going to show you what I've marked for identification as Exhibit H.  I'm going to ask you if you recognize that.

A.   Yes.  It's a reprimand Lieutenant Blackwell gave to Officer Randy Eck.

Q.   Does that refresh your recollection as to

whether you ever disciplined --

A.   I didn't issue that discipline, his lieutenant did.

Q.   But as chief of police you were aware of that?

A.   Yes.

Q.   Isn't it true -- strike that.

Did you read this at the time it was issued?

A.   Yes.

MR. MEISENHELDER:  Move to admit Exhibit H.

MS. COPELAND:  I haven't seen it.

MR. MEISENHELDER:  I was just going to get you a copy.

MS. COPELAND:  Okay.  Can I ask a preliminary question before I -- is that okay?  Do you mind, Jay, if I ask him a preliminary question?

MR. MEISENHELDER:  I have no objection.

MS. COPELAND:  And I'm sorry, this was a one-day suspension?

THE WITNESS:  I believe it was a written reprimand.

MS. COPELAND:  Oh, written reprimand.  And this was issued by a lieutenant.  And they have the authority to do that?

THE WITNESS:  Yes.

MS. COPELAND:  Without the need for you to do anything?

THE WITNESS:  Yes.

MS. COPELAND:  You can introduce it.

THE WITNESS:  Just to make -- I sign -- I sign every reprimand before it leaves and goes to the Merit Commission.  But I didn't -- I did not issue this.  He investigated it, I just approved it.  Upheld it, so to speak.

BY MR. MEISENHELDER:

Q. Now, can you -- according to this reprimand, why was Officer Eck disciplined?

A. For using profanity and being unprofessional to a motorist.

Q. That was while he was in uniform, right?

A. Correct.

Q. In fact, he -- he encountered an elderly woman that was driving down the street

dragging a recliner behind her car, right?

A. Correct.

Q. And according to this woman, Officer Eck came up to her and began using profanity and yelling for her to get out of there.  She said Officer Eck used the F word multiple times and would not listen to her.  She said that she kept asking him to stop yelling.  She finally drove away and left the chair behind her.  Is that basically the gist of what happened?

A. Yes.

Q. Okay.  Now, one of the reasons that something like this is -- like what Officer Bowen did is important to you was because it tends to bring the police department in disrepute, right?

A. Correct.

Q. It injures the reputation of the police department.  Now -- excuse me.  Policy 320 says that it's a violation if the officer uses -- engages in conduct the officer knew or reasonably should have known is unbecoming to a member of the police department, is that right?

Page 104

A. Correct.

Q. Would you say that what Officer Eck did in this case, he knew or should have known that it was unbecoming to a member of the police department to engage in that behavior?

A. Yes.

Q. Isn't it true that he should have known that his conduct reflected unfavorably upon the police department and its members?

A. Correct, yes.

Q. And he was given a written reprimand?

A. Yes.

Q. And he's still with the police force, right?

A. Yes.

Q. Let's talk about Officer Eckard [sic].

A. Who?

Q. I'm sorry, Wehnert.

(Whereupon, Exhibit I was introduced.)

BY MR. MEISENHELDER:

Q. I'll show you what I've marked for identification purposes as Exhibit I.  Do you recognize that?

A. Yes.

Q. What is it?

Page 105

A.  It's a written warning for a first offense violation of Policy 320.5.9, subsection G, disrespectful treatment of a police department employee.

Q.  And what does it say occurred during that incident?

A.  It doesn't say anything because my narrative isn't attached.

Q.  Well, let's ask you -- let me ask you some questions about your narrative.  What do you recall Officer Wehnert doing that merited this warning?

A.  Once again, I'm not going to use a name because I think their privacy needs to be respected, but we have a female officer that dates a male officer, Officer Wehnert.  They were buying optics for their guns as a group purchase.  Officer Wehnert contacted the female officer and asked if he could stop by her house to pick up the money for the optic.  She stated yes.  When he stopped by her house they had a discussion, I believe the female officer said that if she and the male officer ever split, he can have the house and she's taking the camper.

Page 106

And Lieutenant Wehnert said, how long have you and your partner been together. And she answered it, and he responded, yeah, right, as if he was accusing her of being with the male officer while he was still married. She filed a complaint with me, and I investigated it. Officer Wehnert stated that, yes, he didn't really mean anything by it, he was joking, but it was still a disrespectful comment. Again, you can't just insinuate that they were together before she said they were.

Q. Isn't it true that the officer we're talking about told you that Officer Wehnert basically cornered her in her house?

A. She was not in her house, she was in a camper. And, yes, I believe she did say that. But there were --

Q. Thank you.

A. Okay.

Q. Didn't she say that he made several sexual suggestions and advances to her?

A. No, she did not.

Q. And isn't it true that Wehnert was on duty at the time?

A.   I believe he was, yes.

Q.   And he was wearing his uniform?

A.   Yes.

Q.   Do you think that Officer Wehnert should have known that that kind of conduct was unbecoming to a member of the police department?

A.   No, I don't.  Because -- well, I guess I do. I mean, the comment was inappropriate.  I think Officer Wehnert was thinking he was being funny.  I don't think he meant to offend the female officer.  But once again, it doesn't matter what I think, it's what he did.  And that's what he was disciplined for.

Q.   And so what you're saying is that Officer Wehnert didn't -- according to the officer involved, Officer Wehnert did not make any sexual advances to her?

A.   No, she never stated -- she -- her complaint was initially that it was sexual harassment. But there were --

Q.   Right.

A.   -- there were no sexual comments made, she didn't state there were any sexual comments made.  She felt that she was disrespected

Page 108

because he insinuated that -- and because he was standing at the door and she was inside her camper, that she felt like she was trapped. However, if you step into someone's doorway to talk to them, I don't know that you can -- there was -- there was nothing for me to -- there was no proof to suggest that he was trying to trap her in there. He didn't say anything, there was no evidence of that.

MR. MEISENHELDER: I have no further questions for the witness at this time. I would like to keep the option to recall him later.

MS. MEIER: As your witness?

MR. MEISENHELDER: Yes.

MS. MEIER: Okay.

Redirect?

MS. COPELAND: Thank you.

EXAMINATION BY MS. COPELAND:

Q. You were asked if you ever issued policy violations for 422?

A. Yes, mobile data center use.

Q. Didn't you actually issue that with the five officers in this case?

Page 109

A.   Yes.

Q.   You were asked if you ever issued a policy violation for 321?

A.   Yes.

Q.   And you actually have issued that with all five officers involved in this case?

A.   Yes.

Q.   Same thing with 320?

A.   Yes.

Q.   You issued it with all five officers in this case?

A.   Yes.

Q.   We talked briefly about Officer Eck?

A.   Yes.

Q.   If Officer Bowen had just screamed the F word at a woman on the street multiple times, would he have just gotten one day -- I'm sorry, a written suspension or a written reprimand, whatever happened?

A.   Well, once again, I didn't issue that.  That would have been the discretion of the supervisor that was investigating it. However, yes, I would not have sought termination for that violation.

Q.   Officer Eck has never been accused of using

this kind of racial profanity, has he?

A.  No.

Q.  And you've ignored it?

A.  No.

Q.  What about Officer Wehnert?

A.  Wehnert?  No.

Q.  Had he ever been accused of using this kind of racial profanity --

A.  No.

Q.  -- repeatedly for months?

A.  No.

MS. COPELAND:  I have no further questions.

MS. MEIER:  Anything on that?

MR. MEISENHELDER:  Nothing.

MS. MEIER:  Any of the Commissioners have questions?

MR. BROGAN:  I have a couple.

You said this occurred by a deputy. Have you -- did you go back and check any kind of pattern or abnormalcies that would appear on stops, tickets by Officer Bowen?

THE WITNESS:  Yeah, so we -- we looked at -- there were so many -- this extended over two years, right.  So we did do

random pulls of traffic stops for the officers on nights that they had made a specific comment.  These are all, I have to say, some of the -- well, the most productive officers statistically on our agency.  They are very busy, hard workers.  No doubt.  They stop a lot of vehicles at night.  I did not see any patterns in which would suggest that it was all one race or another.  It was kind of mixed on the nights that we checked.

I will tell you, though, that as the chief, I feel -- I do feel obligated to prove to the citizens that we protect and serve that it is not systemic throughout our agency, that this was one group of bad actors.

So we have hired Dolan Consulting to do a comprehensive study of our arrest and traffic stops over the last few years.  It will take about a year for them -- well, nine months is what they're quoting me, to have the results.  But I need to know and the public is going to demand to know if our officers were, in fact, profiling certain groups of people.

MR. BROGAN:  And the same question, though, in a different -- anywhere in the conversation did other officers try to tamp down the statements, trying to neutralize it, trying to, like, whoa, going overboard here?  Was there any conversation like that by other officers?  And I got my fingers crossed on this.

THE WITNESS:  No, no.  And one thing that I did notice is this seemed to -- the majority of this type of -- the statements that were made, this conduct, began around November of last year.  And it progressively got worse as we went on.  And I don't know where that -- where that change had occurred.  I believe one of the officers that was interviewed made a comment that somehow it because the culture of that shift.  And -- but, yeah, it wasn't the entire two years.  This started around November of 2022, and progressively got worse as it went through the spring.

MS. MEIER:  Any other questions from the --

MS. TRIETSCH:  I have a question.

Page 113

Regarding these policies that we got exhibits of, 320, 422, 321, can you explain, how many officers receive copies of these policies?  And do they -- are they e-mailed to them, did they sign off that they read all these?  How do we know --

THE WITNESS:  Yes.

MS. TRIETSCH:  -- that they were aware of not just these policies, but other policies?

THE WITNESS:  So in 2021, we hired Lexipol, which is the gold standard for policy writing for public safety across the globe.  They -- we worked for about a year with them to take the policies that we had, update them, and create a new policy manual. They have a team of attorneys and policy writers who specialize in public safety that draft these.

The really good thing about Lexipol is, number 1, all the officers, when they're issued -- and I can't remember, I think I gave them 90, maybe 60 days when we issued the new manual, to go through it all.  And then they have acknowledge electronically

that they read each one and understand it.

They're also -- they receive what's called daily training briefs. They receive about 30 of them a month from Lexipol where it gives them policy type situations. And they have to answer the multiple choice questions as to what the policy states. They're basically practical type questions.

The other thing about Lexipol is that they continuously, anytime the law changes, it's automatically -- that policy is updated and sent and an acknowledgment has to be given. So it's very structured.

MS. TRIETSCH: So in your opinion, the five that were disciplined were well aware of the policy?

THE WITNESS: Yes. And I think, you know, some of their comments even suggest that they knew that they were violating policy.

MS. TRIETSCH: Okay.

THE WITNESS: Yeah, they would have acknowledged every one of these policies.

MS. MEIER: Anything else?

Any questions on the Commissioners' questions?

EXAMINATION BY MR. MEISENHELDER:

Q. I just want to make sure I understand what you said, Chief Ison. You're saying that when you look at the patterns from the officers that were involved in this, you said you did not find any kind of pattern that suggests that they were profiling?

A. No, not definitively, no.

Q. Thank you.

MS. MEIER: Anything else? Any other witnesses?

MS. COPELAND: I have one other, but could we break?

MS. MEIER: Yes. We are now in recess and it is 7:18.

(Whereupon, a recess was taken.)

MS. MEIER: I have it 7:35, and we are going back on the record.

MS. COPELAND: We call our final witness, Doneisha Posey. She is appearing virtually.

Can you see -- can you hear us?

MS. POSEY: Yes, I can hear you.

Page 116

MR. MEISENHELDER:  Your Honor, Madam Chair, I am going to object to this witness's testimony.  She's -- first of all, I know we have not exchanged witness lists in advance, but in the case of an expert witness, which Ms. Copeland has presented this witness to me as being an expert, I needed to have time to exam her curriculum vitae, to look into her publishing, what she's going to say.  I cannot be expected to cross-examine an expert witness when I don't know who that witness is in advance.

The second reason I would object is because unless this witness talked to Chief Ison at the time Chief Ison was making the decision to recommend termination, her testimony is irrelevant.  Chief Ison has said this is what he thought when he was making the situation.  The testimony of an expert witness as to whether Chief Ison is correct or not is irrelevant.

MS. MEIER:  As I recall, when we had a conference, I believe it was the first part of September, both of you indicated -- you wanted to know if you should exchange --

Page 117

set deadlines for witness and exhibit lists. And at that time, I told you that I was not going to impose any deadlines, I would leave that up to the two of you to discuss that.

So there's not been any restriction as to disclosure or nondisclosure. I don't know if you asked for a witness list and were refused, but I guess my position will be -- would be is that if you wanted to know the witnesses in advance, you could have asked counsel for a list of her witnesses and their expected testimony.

MR. MEISENHELDER: With all due respect, Ms. Meier, my point is that there's a difference between a regular witness, a fact witness, and an expert witness.

MS. MEIER: But you could have asked if she had any expert witnesses. That's allowed.

MR. MEISENHELDER: Well, she should have disclosed that she was going to call an expert witness.

MS. MEIER: Did you ask?

MR. MEISENHELDER: No, I didn't. Because quite frankly, Your Honor, Ms. Meier,

Page 118

I never anticipated that an expert witness would be required in this case.  And, again, there is a fundamental difference between trying to cross-examine an expert witness on her opinions, her theories, her findings, when I haven't -- I had no idea this witness was going to be called.  I have no idea what her background is, I haven't seen her curriculum vitae.  All I know is that Ms. Copeland is presenting this witness as an expert in diversity and equity and inclusion.

MS. MEIER:  Well, and you will have the opportunity to cross-examine this witness, and as I indicated with preliminary instructions, sir, that each one of you, each side can present your evidence, your witnesses, you can do rebuttal, you can do direct examination, you can do cross-examination.  And so you are going to be given the same opportunity to present your case as the City will.  And if -- if you -- if the two of you didn't even ask each other who the witnesses were going to be so that you would know in advance, I don't see how that's going to prohibit Ms. Copeland from

calling her witnesses.

MR. MEISENHELDER:  It won't -- it won't inhibit Ms. Copeland, Your Honor, it will inhibit me.  I have no way to cross-examine her.  I have no idea what her --

MS. MEIER:  Sir, you could have had the opportunity if you had asked and then asked for the opportunity to depose her or for additional information.  And you're -- you've indicated you didn't even ask who her witnesses were going to be.

MS. COPELAND:  And if I may intervene, a week ago Tuesday I sent Mr. -- I sent Jay an e-mail and asked would he like to exchange witnesses and exhibits, and he said -- I'm just going through -- he sent two rounds of discovery to the City and never asked who the witnesses were going to be.

I asked him last Tuesday, would you like to know witnesses and exhibits.  Well, by Friday I probably will have gone through everything, and then, sure, we could exchange.  That never happened.

MS. MEIER:  I don't see -- any

prejudice it might be to you would be at your own doing, sir.  Because if you did not ask who the witnesses were going to be and you didn't follow up asking so that you could do your own investigation, I can't fault that to Ms. Copeland.

So I believe it is appropriate to allow this witness to testify.  And would you ask her to spell her name, please.

MS. COPELAND:  Yes.  May I begin?

MS. MEIER:  Sure, yes.

EXAMINATION BY MS. COPELAND:

Q.  Please state your name for the record.

A.  Doneisha Posey.

Q.  Can you spell that, please.

A.  D-O-N-E-I-S-H-A, and Posey is P-O-S-E-Y.

Q.  What do you do for a living?

A.  (Zoom interruption) diversity, equity inclusion consultant.

THE COURT REPORTER:  Can you repeat that.

THE WITNESS:  Did you lose me?

MS. COPELAND:  You're fading in and out.

THE WITNESS:  I'm going to go off

camera to see if that works.  Is that helpful?

MS. COPELAND:  That was helpful, yes.

BY MS. COPELAND:

Q. Let's try again.  What do you do for a living?

A. I am a civil rights attorney and an equity inclusion consultant.

Q. Can you provide a brief summary of your education, please.

A. Yes.  So my education, I attended Marian University for undergraduate degree in political science.  And I have a law degree from Indiana University Robert H. McKinney School of Law, and several certificates and small specialization.

Q. Since graduating law school, what --

A. Can you hear me?

Q. Yes.  So far we can.  Since graduating law school, what have you done professionally?

A. Yeah, so I started off in private practice. It was a small law firm where I mostly did immigration law and civil rights (Zoom interruption).

MS. MEIER:  Are you there?

THE WITNESS:  I'm calling in from my phone.  I think that will alleviate our issue.  Can you hear me?

MS. COPELAND:  No, now it's echoing.

THE WITNESS:  I've turned off the other one.  Can you hear me?

MS. COPELAND:  Yes.

BY MS. COPELAND:

Q.  Okay.

A.  You asked me what I did after law school?

Q.  Correct.

A.  Okay.  So after law school, I was in private practice doing mostly immigration and civil rights law.  And then for about four years I went to the Civil Rights Commission where I was first the administrative law judge where I presided over cases of discrimination in an administrative hearing format for employment, housing, public accommodation, credit and education cases.

And then within the Civil Rights Commission, I moved into being the Deputy Director and General Counsel where I led all

Page 123

of the Civil Rights Commission in litigation. And I also made the decision on hundreds of cases each year determining if there was probable cause or not to move forward with representing the State of Indiana.

From there, I moved into position within the diversity, equity, and inclusion context, first with Ivy Tech Community College where I served as the Vice President of Diversity for the entire Ivy Tech school system, serving over 120 students a year and 7,000 employees.  And so now I've moved from Ivy Tech to a consulting firm called Black Onyx Management where we work with companies and organizations to ensure discrimination isn't happening and -- you know, within their organization by helping with strategic initiatives and policies to help create opportunities and access for everyone.

And I've also been an adjunct professor of law at the Indiana University School of Law where I'm a graduate of since either 2018 or 2019, and I've been teaching courses such as Race in the Law, and Housing Discrimination and Segregation.

Page 124

Q.  And we need to stop you temporarily because you were not sworn in.  Can we swear you in?

A.  Yes, please.

(Witness sworn.)

MS. MEIER:  You'll have to start all over to get it on the record.

MS. COPELAND:  Do we have to go through all the education and everything again?

MS. MEIER:  If you want that as part of her sworn testimony.

MR. MEISENHELDER:  Madam President, I'll stipulate to -- to what Ms. Posey has already --

MS. MEIER:  Okay, all right.  So the stipulation, prior to taking the oath, of everything this witness has previously testified to, that it will -- it will be now sworn testimony.

MS. COPELAND:  All right, I appreciate that.

BY MS. COPELAND:

Q.  How long have you held the role with Black Onyx Management?

A.  A little bit over a year I've been at Black

Page 125

Onyx Management.

Q. And do you still also teach?

A. Yes, I do.

Q. Where?

A. At Indiana University Robert H. McKinney School of Law.

Q. What do you teach?

A. I teach Race in the Law, and sometimes depending on if they need an additional instructor for Housing Discrimination and Segregation, I will always -- I will also teach that course.

Q. Is it fair to say that most of your legal career has been devoted to civil rights matters and issues involving race and discrimination?

A. Yes.

Q. We have today used the phrases racism and discrimination a lot. Can you give us a brief understanding of those and any differences between race and discrimination?

A. Yes. So in the context of racism, it is the use of, you know, language, behavior, that would be discriminatory to a certain group or unwanted of a certain group. And

discrimination is acting upon those statements or behaviors in that type of format. So in terms of there being a difference, you can be racist and make statements, or use foul language, behavior, but it doesn't necessarily rise to discrimination until you act upon that.

And then specifically if you think about this in the legal context, under Title VII of the Civil Rights Act of 1964, you -- I think I've heard someone allude to before that the conduct must be severe or pervasive. And that is the exact language within Title VII of the Civil Rights Act. And you want me to go into that?

Q.   No, that's okay. How does bias fit into racism and discrimination?

A.   Yeah, so bias is similar to -- well, basically, when we think about bias, we're thinking how we perceive the world around us. Bias is not a bad thing, right. We need bias every day in order for us to make decisions. As you're driving, for example, if you see a car that might be speeding going across an intersection, you might slow down just in

case that car is going to go too fast, right. It gives us the ability to determine kind of that fight or flight. And so bias is important in everything we do.

Now, we are also -- we've also been learned or been taught different biases through our own experiences, our own lived experiences with our families and friends and schools, but also with the media, just the culture, the world around us. And so those biases are also in our minds. And so the issue with biases that might create negative biases towards someone, is if you act upon those biases.

So, again, when we think about having a bias, if it is a negative bias towards a certain demographic or a stereotype against a an entire group of people, that could just be a bias, an unconscious bias that you hold, or racist thought or a racist something that you say, right. But until you act upon those, that is when it becomes discrimination.

Q. You've -- I provided you with a copy of the text messages that were exchanged between the officers, correct?

Page 128

A.    Yes.

Q.    You've read them?

A.    Not all 5,000 pages, but several, yes.

Q.    If this -- if Officer Bowen testified that this is merely locker room talk or just funny banter between friends, is this -- is what you read funny banter?

A.    No.

Q.    Why not?

A.    Because the language that was used would be considered racial discrimination. Specifically, the conduct would arise to a level of discrimination, like I said, with it being both severe and pervasive to create an environment that a reasonable person would consider to be intimidating or hostile or abusive.

      And so some of the terms that were used by Mr. Bowen, I would say, are severe in and of itself, particularly the term 13 Percenter. So the 13 Percenter is a discriminatory term really used to describe a false narrative that although Blacks are only 13 percent of the population, they commit 50 percent of all crime. And so thinking of

Page 129

all Black people in this way is hurtful, racist, and quite factually wrong. And so it creates a false sense that no matter what, right, Black people will be committing a crime. It is not just a bias, a thought that you're having. But considering his position as an officer, speaking in the false narrative is scary and egregious and could potentially create conduct -- negative and racist conduct.

And so the other, you know, 5,000 pages or so, also shows just how pervasive this was. There are months and hundreds of discriminatory comments made in these instant messages, terms such as Jew and faggot and coon, whore, retard, right, they are all very hurtful, racist, homophobic, and sexist comments.

Q. If the argument is that these messages didn't hurt anyone, they were just -- they're on paper, no one really knew what they were saying, what's your comment on that?

A. Well, unfortunately, in this particular situation, all of these are public records. There's always -- also been in the media.

Page 130

The town, those who visit the town, those who live, work, et cetera, in the town, have access and could have knowledge of this. So this is not just something that's on a piece of paper.

These are comments that truly hurt different demographics, folks that already feel underserved and undervalued by many systems, including the police force, not particularly this police force, but in general. And so when you have comments like this, whether they are on paper, right, or on a computer or said, you know, live, they're still very hurtful, very egregious, very discriminatory.

Q. Do you recall reading any messages that could suggest there was racial profiling occurring?

A. I don't remember off the top of my head, but there was some messages -- I might get this wrong in terms of -- I mean, they were saying there were some 13 Percenters up here at the gas station, and I don't recall which of the officers said it because I don't have the page. But it was said that there were 13 Percenters up at this gas station, and the

other one said, you know, I'm on my way, right. And so that would insinuate that they're -- just because they're Black they're coming to -- I don't know, I don't know what they would do, but as an officer, what do officers normally do, right. They're here to protect and serve. And so there was no conversation about that these individuals are doing anything wrong. I -- I don't know why they would want to go and just see what they were doing because they were Black.

Q. Based on your experience, how does this type of profanity negatively impact the police department?

A. Well, it can create a toxic work environment, right, if there are officers who might belong to any of these protected classes, whether they belong to those classes or not, but feel morally that those comments were wrong. It can just damage the morale and cohesion among officers. It may also lead to perceptions of, like I said, systemic racism within the force, and which would, you know, erode community trust.

     I think community trust and credibility

is at hand here.  Using this discriminatory language really undermines Mr. Bowen's ability to serve the community impartially and professionally.  I'm not saying it has, but it can lead to bias in his decisionmaking and hindering his effectiveness and potentially causing harm to marginalized individuals.

Q.  You may have touched on it a little bit, this is my last question.  How does this kind of publicity on this type of language affect Greenwood?  How can it affect Greenwood?

A.  Can you repeat, I can't hear that well.

Q.  Yeah, I'm sorry.  Yeah, this is going to be my last question.  So how does this kind of language, how can it potentially affect this community?

A.  Yes.  So this type of language affects the community by really perpetuating a perceived culture of discrimination within the police force.  So it undermines that relationship between law enforcement and the community, particularly among minority groups who are often a target of such derogatory terms that we heard -- or saw, excuse me, in the instant

messages.  Community members may lose faith in the police department's ability to protect and serve them fairly, which could also lead to increased tension and strained relations.

You know, law enforcement officers are entrusted with a lot of power and authority. And when we think about the police force, they have to uphold these high standards of conduct.  And so, again, it would just really undermine the public's trust and the police's commitment to justice and fairness.

MS. COPELAND:  Thank you.

EXAMINATION BY MR. MEISENHELDER:

Q.  Ms. Posey --

A.  Yes.

Q.  -- you said that a bias doesn't become discrimination until it's acted on.  Is that what I heard you say?

A.  Correct.

Q.  So is there anything in the information that you were given about Officer Bowen to show that he ever acted on any of these biases that he had?

A.  So in his professional capacity, by utilizing the communication methodology that they have

Page 134

within the police force with other officers, is, in my opinion, him acting upon his biases.

Q. Now, you talked about the fact that this could lead to feelings among different minority groups. Do you have any -- were you given any information that anything that Officer Bowen or the other officers said did become public knowledge?

A. Yes. There are news articles that talk about this particular case, that talk about the different things that were said. So, yes, it is public knowledge.

Q. Were you given any information that indicates that Officer Bowen ever racially profiled anyone?

A. No, I was not given that information.

Q. Did you receive any information that any of the officers involved in this ever racially profiled anyone?

A. No, I was not given that information.

Q. Were you given any information to suggest or that would lead you to believe that any individual citizen ever complained about the language that Officer Bowen and the other

officers used?

A. No, I have not received that information.

Q. And finally, you used the words severe or pervasive, you were describing Title VII of the Civil Rights Act.  Isn't it true that the term severe or pervasive is used to determine whether something has created a hostile environment?

A. It can be used to describe a hostile environment.  Harassment in general is -- is really the category for using severe and pervasive -- severe or pervasive.

Q. And in order for it to create a hostile environment, don't the people who are experiencing the hostile environment have to know the language is being used?

A. It depends.

Q. It depends on what?

A. It depends on the facts in the particular case that you're saying.  In this context, the community at large may know about the language that has been used by Officer Bowen and others because this is a public matter, it has been out in the media, anyone can request these records.  It is public.  So

therefore, the public does know that these comments -- that there were some severe comments, particularly the 13 Percenter and coon, and faggot, would be severe in and of themselves. And they would also be able to see that the comments were pervasive, that they lasted several months, there were hundreds of these comments made during that time.

Q. Do you have any evidence that you could point to that that in fact did happen? Not -- I'm not asking you what could have happened, what may have happened. I'm asking you whether you have any evidence to suggest that that did in fact happen?

A. That what in fact happened?

Q. That people were aware of these comments and as a result experienced a hostile environment?

A. I am a member of the community. I've seen these records. I've seen that they were pervasive. And I would say in my -- in my expert opinion on these matters, that a reasonable person would consider that to be intimidating, hostile, or abusive, and those

Page 137

are the three categories that it must be in to say that something is pervasive, right. So I would say me, as myself, that I would consider the comments to be pervasive enough to be considered intimidating, at least.

Q. But you were given this information by Ms. Copeland, correct?

A. Correct.

Q. Do you have any evidence that anyone outside of the people involved in this matter got information from the media that caused them to experience a hostile environment?

A. It's not just hostile.  It could be intimidating, hostile, or abusive.  And so if I know of anyone else who had heard about this in the media, if they would have considered it to be intimidating, hostile or abusive?  I did not talk to anyone else particularly about that, no.

Q. So your answer is no, you don't have any evidence that anyone outside in the general community ever experienced a hostile environment, or abusive environment, or intimidation because of the communications that Officer Bowen and the other officers

engaged in.

A.   No.

MR. MEISENHELDER:  I have no further questions.

MS. MEIER:  Redirect?

EXAMINATION BY MS. COPELAND:

Q.   If Officer Bowen went to go sit at Speedway just because there were Black people there and communicated that in a message, is that racial profiling?

A.   In my lay opinion, yes.

Q.   So when they say, "Speedway would be a good spot to sit, 13 Percenters, hundred percent," the only reason they went to Speedway, nobody's reported a crime, Black people, sitting at Speedway, so they're going to go sit there, that's racial profiling?

MR. MEISENHELDER:  Objection.

THE WITNESS:  It is.

MR. MEISENHELDER:  Argumentative.

BY MS. COPELAND:

Q.   If Officer Bowen suggests to one of his colleagues that he is going to try to run the plate of a woman sitting next to him in the car, the only reason he's doing it is because

she's Black, that's racial profiling, correct?

A.   Yes.

MS. COPELAND:  Nothing else.

MS. MEIER:  Any re-cross?

BY MR. MEISENHELDER:

Q.   Ms. Posey, if Officer Bowen went to sit at the Speedway on County Line Road because there were Black people there, and he didn't arrest or stop or interact with any of those people --

A.   Say that last part again.  You said he went to Speedway on County Line Road, and say that part again after that.

Q.   He didn't arrest anyone, he didn't stop anyone, he didn't interact with anyone, would that be -- is that really racial profiling at that point, or is that a bias?

A.   If he does nothing or says nothing?

Q.   Yes.

A.   No.

MR. MEISENHELDER:  Thank you.  I have no further questions.

MS. MEIER:  Redirect?

MS. COPELAND:  No.

Page 140

MS. MEIER:  Can this witness be excused?

MS. COPELAND:  If you have no questions.

MS. MEIER:  Do you all have questions?  No?

MS. COPELAND:  You can leave us. Thank you.

THE WITNESS:  Okay, thank you.

MS. MEIER:  Mr. Meisenhelder, you can start your case now, or do you need a few minutes?

MR. MEISENHELDER:  If I could have just a couple minutes.

MS. MEIER:  Sure.  We're in recess now.  It is about 8:09.

(Whereupon, a recess was taken.)

MS. MEIER:  Okay.  We're back on the record, please.  It is 8:11.

MR. MEISENHELDER:  Officer Bowen calls Chief Ison.

THE WITNESS:  Do I need to be sworn in again?

COURT REPORTER:  You are reminded that you are still under oath.

THE WITNESS:  Okay.

EXAMINATION BY MR. MEISENHELDER:

Q.  Chief Ison, I want to go back to primary night.  Last year.  You talked about the fact that Officer Bowen was making false allegations.

A.  Correct.

Q.  Is that right?

A.  Yes.

Q.  What specifically were the allegations that you believe are false?

MS. COPELAND:  I'm going to again object because nothing about that night, the discipline that was issued, has anything to do with this case.  This case is only about the instant messages.  Period.

MR. MEISENHELDER:  With respect --

MS. MEIER:  The -- go ahead.

MR. MEISENHELDER:  With respect, Ms. Meier, Ms. Copeland opened the door.  She specifically asked Chief Ison about that night in her direct examination.  She opened the door.

MS. MEIER:  And I was going to

say, it has been mentioned tonight in your case. So I think he has an opportunity to investigate that a little bit. But I don't want to get -- I don't want to get focused too far on that, but it has been brought up, you're correct.

THE WITNESS: Could you please repeat the question.

BY MR. MEISENHELDER:

Q. What specific social media posts did Officer Bowen make that you believe are false?

A. Specifically, that I cover things up, sweep things under the rug. I hide -- or what was it, I report our crime -- I lie about our crime stats. I -- I'm not transparent with the public. I can tell you without hesitation I've never lied about a stat that I have provided to the media.

Q. Let's -- let's unravel that just a little bit. You said that Mr. Bowen said that you were not being transparent with the public.

A. I don't have the post in front of me. I don't want to speculate without being able to see exactly what you're referring to.

Q. So what you're saying is, you generally

Page 143

perceived him as saying that you were lying and covering things up?

A.  Yes.

Q.  Did he -- do you recall if he ever actually used those words?

A.  Yes, I believe he did.

Q.  Do you believe -- do you have any reason to believe that he doesn't honestly believe what he's saying?

A.  I don't care what he believes.  I care about what the facts are.

Q.  What if it's just a difference of opinion?

A.  Well, we have a policy that prohibits what he did, and I took action for that violation.  It was undermining my office and it was jeopardizing my effectiveness as a leader within my agency and in the community.

Q.  But how -- how did he do that if -- strike that.

Did Officer Bowen ever identify himself in those posts as a Greenwood police officer?

A.  No, he did not.

Q.  Does his Facebook profile identify him as a Greenwood police officer?

A.  I'm not all that Facebook savvy, but I don't

believe he did.

Q.  Did he ever appear in any photos in connection with these criticisms that showed him in a Greenwood Police Department uniform?

A.  No.

Q.  Is there any way that a person in the general public would know that Mr. Bowen was a Greenwood police officer from these posts?

A.  Probably not unless they knew him.

MR. MEISENHELDER:  That's all the questions I have for this witness.

MS. MEIER:  Okay.  Do you have any cross-examination?

MS. COPELAND:  If I could ask permission to go outside the scope and ask a question on what I asked earlier.

MS. MEIER:  Go ahead.

EXAMINATION BY MS. COPELAND:

Q.  Have the officers ever been told that these instant messages are public?

A.  Yes.

Q.  Have they been told not to post things that are inappropriate, offensive, and vulgar?

A.  Yes.

MS. COPELAND:  That's all I have.

Page 145

                        MS. MEIER:  Anything on that?

                        MR. MEISENHELDER:  Nothing
    further.

                        MS. MEIER:  Next witness?

            Oh, I'm sorry.  Commissioners, do you
    have any questions?  Okay.

                        MR. MEISENHELDER:  Call Sam
    Bowen.

    EXAMINATION BY MR. MEISENHELDER:

Q.  How long have you been -- were you a police
    officer for Greenwood?

A.  I was sworn in in Greenwood October 19, 2022
    [sic].  So it would be three years this
    month.

Q.  2022?

A.  2020.  Sorry, 2020.

Q.  Why did you want to become a policeman?

A.  Initially it was never my full intention.  As
    a kid, I always thought it was really cool, I
    really respected the police.  And I initially
    went to college for graphic design.  Quickly
    realized that wasn't for me, and started
    making friends with some police officers.  I
    really respected them, and thought it was
    something that I could do and help make a

Page 146

change in the community.

Q. You've heard Ms. Copeland reading the IMs that you transmitted. You've seen the -- you've heard the chief testify about them. Did -- do you deny that you -- that you sent those messages?

A. No, I do not.

Q. Looking back on them now, what do you think about those messages?

A. It's tough reading back on them. It's not anything I'm proud of. It was, for me, humor between friends and a way to deal with stress. And I think a lot of people in this police department can attest the past two years have been very difficult for Greenwood, going from -- I mean, there's a whole list of critical incidents I was involved in. And as a new officer and a young officer, starting your career off that way, I think a lot of veteran officers didn't really have to go through that. It's a different time with police now. And being in so many critical incidents in such a short amount of time really weighs heavy on you.

And I quickly realized that around the

police department the way you deal with that or the way people were dealing with that was through just sort of humor between other officers. And that's how it started with me. It wasn't anything I ever did before working at the police department, and it became that culture because that was the culture that worked, that's how it came about to me. I'm not happy about it. Looking back at it, it's not anything I wished I would have said.

But it was -- you know, sitting here listening to people thinking they were in my head, thinking that I was sitting there racially profiling people, I've heard almost every witness up here say, you know, he said this comment, he was racially profiling that person. That's not at all what it was. And they've said, and there's proof with what they said, that there is no instances of me doing that.

Never once in my career have I racially profiled people. In fact, you can go around and ask people, I get in arguments all the time with my shiftmates because I would feel like they were doing something that skirted

the line with maybe not being lawful to make an arrest. I would argue with them and say, no, I don't think that's right, you need to make sure you do everything by the book. That's kind of what I was known for on my shift is I always made sure -- I was a very big advocate of protecting people's rights before getting stat for the arrest. I'd rather make sure it was a good arrest.

Q. You heard Chief -- Assistant Chief Fillenwarth and Chief Ison talk about what they see as the -- the problem they might have with arrests that you've made in the past. How do you respond to that?

A. There's not a single incident I was ever involved in that my body cam was not on. At any point somebody can go watch my body cam and see how I actually interacted with the public. And they won't find anything that proves that I'm racially profiling, discriminating. I was giving nothing but what the public of Greenwood deserves, and that was excellent service from their police department. And I felt like during my time at Greenwood, I led a good example to the

public of what the Greenwood police officers were, how we treated them, took care of them, and at the same time enforced the law that needed to be enforced.

Q. Is there any arrest or stop or any other action that you've taken as a police officer that you would not be comfortable defending against someone who said, I read those instant messages you sent, that shows you're a racist, that shows you're a sexist, that shows you're anti LGBTQ; anything that you would not feel comfortable in defending?

A. No, there's not been a single arrest or citation or interaction with anybody in my entire career that I would not defend, that I would say I treated them fairly and unbiasedly.

Q. Now, if were you to get a job, either get this job back or at some point in the future if you were to get a job with another police department, would you be inclined to do this, do the same kind of communications again?

A. Absolutely not.

Q. Why?

A. I mean, it -- like I said, it's not anything