UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAM BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01118-RLY-TAB |
| | ) | |
| JAMES ISON and | ) | |
| CITY OF GREENWOOD, INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON MOTIONS FOR SUMMARY JUDGMENT**

In 2023, Plaintiff Sam Bowen, then a Greenwood Police Department ("GPD")

police officer, made several statements on Facebook that were critical of Defendant

Police Chief James Ison and Mayor Mark Myers.  In response, Ison revoked some of

Bowen's employment privileges.  Bowen now sues Ison and Defendant City of

Greenwood ("the City") under 42 U.S.C. § 1983, alleging retaliation in violation of the

First Amendment.  The parties cross-move for summary judgment.  (Filing Nos. 34, 48).

For the reasons explained below, the court **GRANTS** Defendants' motion and **DENIES**

Bowen's motion.

I.     **Statement of Facts**

A.     **Relevant Background**

At all times relevant to this case, Bowen was a GPD police officer, and Ison was

the Chief of GPD.  (*See* Filing No. 36-1, Bowen Decl. ¶ 1; Filing No. 50-2, Ison Decl.

¶ 1).  Generally, Bowen only interacted with Ison "on occasion."  (Bowen Decl. ¶ 3).

1

In 2023, Greenwood, Indiana, had a municipal primary election in which incumbent Mayor Mark Myers ran for reelection against Joseph Hubbard. (*Id.* ¶ 5). Although he did not live in Greenwood and could not vote in the primary, Bowen supported Hubbard because he thought Myers's administration "didn't do their job well and were misleading the public." (*Id.* ¶ 7; Filing No. 50-1, Bowen Dep. at 60–61). According to Ison, the primary was "very contentious." (Filing No. 38, Merit Comm'n Hr'g Tr. at 83–84). At the time, there was a "public debate on social media about the amount of crime being committed" in Greenwood. (Filing No. 39, Myers Dep. at 10; *see also* Bowen Decl. ¶ 8).

In December 2022 or January 2023, Bowen spoke to Ison about his plan to start a security company. (Bowen Dep. at 115–17, 155–56; Filing Nos. 51–52, Audio Recording of Bowen's Conversation with Myers ("Audio Recording") at 1:40–2:09). Ison said he was happy for Bowen and that he would not target or "retaliate against" Bowen for starting his own company. (Bowen Dep. at 116; Audio Recording at 2:07 to 2:11). Bowen thought this was weird because he did not think Ison would retaliate against him. (Bowen Dep. at 116; Audio Recording at 2:12–2:20). At that time, Bowen only had "a little bit" of a problem with Ison's leadership. (Bowen Dep. at 116).

On January 18, 2023, Bowen received a Notice of Counseling/Reprimand regarding his job performance. (Ison Decl. Ex. A; Bowen Dep. at 74). The reprimand described an incident during which Bowen, acting as a Field Training Officer ("FTO") for another officer, did not take responsibility for an OWI and commented that an OWI investigation would "tak[e] too long to complete" and would require him to stay after his

shift.  (Ison Decl. Ex. A; Bowen Dep. at 74).  The reprimand stated Bowen's behavior was "less than desirable."  (Ison Decl. Ex. A).  It also stated that Bowen "is an outstanding Officer and FTO" and that this was his first offense.  (*Id.*).

Bowen thought the reprimand was unfair and also "suspicious" because it was issued shortly after Ison promised not to retaliate against him.  (Bowen Dep. at 116–17; Audio Recording at 2:20–2:30, 3:30–3:46).  Although the reprimand was issued by Bowen's direct supervisor, Sergeant Brandon Cox, Bowen attributed the reprimand to Ison because he "is responsible for his command staff."  (Bowen Dep. at 75, 117–18).  At this point, Bowen began to feel like Ison was retaliating against him.  (*Id.* at 116–18; Audio Recording at 3:30–3:46).  A day later, Bowen resigned from his position as an FTO because he disagreed with the reprimand and did not like the supervision he was receiving in that role.  (*See* Bowen Dep. at 77–78; Audio Recording at 3:00-3:15).

### B.    Bowen's Facebook Posts

In January or February of 2023, Bowen began posting statements on Facebook that were critical of Ison and Myers.  (Bowen Dep. at 49–50).  These comments were made when Bowen was off duty, "on [his] own time."  (Bowen Decl. ¶ 11).  Bowen's Facebook page did not identify him as a police officer.  (*Id.* ¶ 12; *see* Filing No. 36-2, Facebook Comments at 11).

Bowen posted a number of comments on two "Greenwood-centric Facebook pages"—"Greenwood Chatter" and "Greenwood, Indiana Crime Tracker"—that were "open to any individual . . . interested in Greenwood."  (Bowen Decl. ¶ 9; *see* Facebook Comments).  For example, he commented the following:

- ". . . I think something you should wonder is why the Greenwood Police Department has not released any statement about [an incident involving a stolen U-Haul]?  Or why they never notify the public about anything, unless it's hiring 12 new officers right before an election to make the mayor look good." (Facebook Comments at 2).

- ". . . I would say someone recklessly driving a stolen uhual [sic] and shooting a gun then driving said uhual [sic] into a building absolutely warrants a story.  And it's so draining on resources for someone from the police department to take 5 minutes and post what happened on Facebook." (*Id.* at 3).

- ". . . I am saying [GPD] need[s] to be notifying the public of events such as this so if their policy prevents that it should be changed. . . . [M]y grievance is with the police administration not being transparent to the public.  Media is a private business, the police department is a public government agency.  They should absolutely be notifying the public . . . ." (*Id.*).

- "[M]aybe people got upset when liberal mark myers and yes man James ison decided to turn greenwood into little Indy?  People hear news about crime and think that means crime is up . . . what kind of logic is that?  There's more reporting of crime because more crime is happening.  I can't even put into words how much of a dumb comment you just made." (*Id.* at 4).

- ". . . Are you talking about the [local newspaper] article where the chief lied through his teeth and claimed violent crime was not up when there was a homicide 3 days later?  The 2nd homicide this year?  Or how his crime mapping was showing a decrease but that's only because he removed several categories because he didn't consider them crime?  It's amazing you can't see through myers and isons facade of safety.  Neither of them care.  They're too worried about policing their police and tanking morale at the department." (*Id.* at 4).

- "I think we found one of the democrats for myers.  Facts don't matter to them, their precious marky mark is never to blame." (*Id.* at 5).

- "[A]t least he is posting this stuff and not trying to keep it swept under the rug like the current administration.  Notice how anytime something like this happens in any other jurisdiction in the country

that the police department releases a statement?  Not in greenwood, have to keep that hidden from the public."  (*Id.*).

- ". . . I am grateful to know about [the stolen U-Haul incident] at all, no thanks to the stellar police administration."  (*Id.* at 6).

- ". . . I'd imagine the police administration is trying to keep it swept under the rug just like everything else they do."  (*Id.*).

- ". . . I've been advocating for increased transparency from the police department, are you against that?  There is no denying incidents such as this happen in greenwood frequently, I'm saying I want the police department to be releasing statements as to what's going on, how can you possibly have an issue with transparency from the police department?"  (*Id.* at 7).

- "Very honorable of the mark myers gang to attack a man with a false narrative of a situation days before the election.  It's disreputable that myers has chosen to run an attack campaign on Hubbard instead of addressing the issues voters have with him and trying to work for everyone.  Mark Myers is the Nancy Pelosi of Johnson County – a failed career politician who has no understanding of what the people he represents want and refuses to listen."  (*Id.*).

- "[T]here have been 2 murders in the first 3 months of 2023.  There are well known incidents I'm not sure why you're so adamant the murder rate hasn't increased . . . ." (*Id.* at 8).

- "[H]e may not blame Chief Ison but I do.  Him and his appointed road commander's failed leadership has tanked morale at the department. The [GPD] is not a proactive department, they've been forced to be reactive for some time now because of short staffing and the chief's 'police the police' tactics – Chief Ison has made the fear tactic of retaliation his biggest leadership trait. . . . If the leadership at the department was better, . . . lateral transfers would flock to Greenwood. But they won't because unlike apparently everyone who supports mark they can see the issues which are much bigger than he plays them off to be.  No one ever really comments about the mass exodus of police and firefighters coming if Mark Myers wins reelection, a large chunk of them have vowed to leave if he wins re-election . . . Why does Chief Ison care so little about his officers and instead of talking to them and figuring out why they don't like them he doubles

down in his retaliation efforts?  It's because he's not a good leader and not fit for the job he has."  (*Id.* at 9–10).

- ". . . I wish the police department would be more transparent and post what is actually going on all the time.  Unfortunately Chief Ison tries to sweep most things under the rug.  I would also appreciate if they would post their accomplishments of large drug busts, arresting violent felons, etc so we could know how much our police department is doing for us.  I believe it would also significantly boost the officer's morale if they were being appreciated."  (*Id.* at 10).

In addition, Bowen made a Facebook post reacting to a local newspaper article entitled, "Greenwood chief responds to claims crime has doubled in city."  (Filing No. 50-3, Facebook Post; Ison Decl. Ex. C).  Bowen wrote: "Greenwood city officials are trying to mislead you to think there is not a grave problem.  Crime is up and they should not be able to get away with blatantly lying to the public in hopes to skew an election.  Rules for thee not for me."  (Facebook Post).[1]

### C.    GPD Policies

GPD officers must comply with GPD's Standards of Conduct.  (*See* Filing No. 36-4, Policy 320).  The Standards indicate that "[d]iscipline may be initiated for any good cause" and that "[i]t is not mandatory that a specific policy or rule violation be cited to sustain discipline."  (*Id.* § 320.4).  The Standards prohibit, in relevant part, the following: "false, misleading or malicious statements that are reasonably calculated to harm the reputation" of GPD "or its members," (*id.* § 320.5.8(d)); "[d]isparaging remarks" that disrupt "the good order, efficiency and discipline of" GPD or "tend to discredit any of its

---

[1] Defendants also reference a second Facebook post in which Bowen stated that it "[w]ould be nice to see a real leader in the chief position."  (Filing No. 49, Def.'s Br. in Supp. at 6).  This post is not in the record.

members," (*id.* § 320.5.8(e)); any off-duty act "that brings discredit to" GPD, (*id.* § 320.5.8(j)); "[d]iscourteous" or "disrespectful" treatment" of "any member" of GPD "or the City," (*id.* § 320.5.9(g)); and off-duty "conduct which any member knows or reasonably should know is unbecoming a member of" GPD, "is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon" GPD "or its members," (*id.* § 320.5.9(p)).

GPD also has a Speech, Expression and Social Networking Policy ("Speech Policy"). (Filing No. 36-3, Policy 1026). It seeks to set "certain reasonable limitations on the[] speech and expression" of GPD members. (*Id.* § 1026.2). Under this policy, GPD members "retain their rights . . . to support [political] candidates of their choice and to express their opinions as private citizens . . . on political subjects and candidates at all times while off-duty." (*Id.* § 1026.4.1). But it prohibits, among other things, speech or expression that, "while not made pursuant to an official duty, is significantly linked to, or related to," GPD "and tends to compromise" the "reputation or professionalism" of GPD "or its members," (*id.* § 1026.4(b)); "could reasonably be foreseen as having a negative impact on the credibility of the member as a witness," (*id.* § 1026.4(c)); constitutes criticism of GPD "operations, policies, or personnel" that "is factually inaccurate or is made with reckless disregard for its truth or falsity," (*id.* § 1026.4(d)); and "could reasonably be foreseen as having a negative impact on the safety of" GPD's members, (*id.* § 1026.4(e)).

The City's Employee Handbook also contains a social media policy. (Ison Decl. Ex. E). Under the policy, City employees are generally free to have their own social

media accounts and use them "on [their] own time." (*Id.*). But the policy prohibits "address[ing] workplace grievances by posting malicious, obscene, threatening, intimidating, or hostile comments" and asks employees to "[r]efrain from posting reckless, malicious, or untrue comments that may not be protected by law." (*Id.*).

### D. Reactions to Bowen's Facebook Posts

In January or February 2023, Ison became aware that Bowen and at least one other GPD officer were posting on social media in a manner that he believed was inconsistent with GPD's policies. (Filing No. 64, Ison Dep. at 13, 22). Accordingly, on February 1, 2023, Ison sent an email to all GPD officers, stating, "It seems that there may be some confusion as to our department's policy regarding []Speech, Expression, and Social Networking[]." (Bowen Dep. Ex. 11). He recommended the officers review the policy, specifically sections 1026.4 and 1026.4.1. (*Id.*).

Bowen thought Ison's email was "hypocritical." (Bowen Dep. at 144). After receiving the email, Bowen created a document compiling screenshots of Ison's personal Facebook page and noting how he thought Ison was violating GPD's Speech Policy. (Bowen Dep. at 133–34, 142; Bowen Dep. Ex. 10).

After the April 2023 meeting of the Greenwood Police Merit Commission ("Merit Commission"), Wendy Trietsch, the Merit Commission president, asked Ison if he had seen "posts online" from GPD officers that "bother[ed]" him. (Ison Dep. at 25). Ison responded that he knew officers were posting on social media in support of Hubbard, which did not violate GPD policy. (*Id.*). He added, however, that Bowen and another officer were "crossing the line and violating policy" with their posting by "airing personal

employee grievances, discussing departmental business, and being disrespectful towards other members of the Agency." (*Id.* at 25–26). Trietsch asked why Ison was not doing anything about their posting. (*Id.* at 26). Ison said that he was ignoring their posts and that, because of the primary, he "did not want to give the perception that these officers were having action taken against them for supporting a political candidate." (*Id.* at 26; Merit Comm'n Hr'g Tr. at 84–85). Trietsch and Ison discussed concerns about the "precedent[]" that allowing the posting to continue would set for the future. (Merit Comm'n Hr'g Tr. at 85). Trietsch "advised" Ison that the Merit Commission "could take action on [its] own" regarding the posts. (*Id.*).

Shortly thereafter, GPD staff brought several of Bowen's posts to Ison's attention. (Ison Decl. ¶ 4). Members of the GPD asked Ison why he was allowing the posting to continue. (Merit Comm'n Hr'g Tr. at 85). They shared that they thought the posts were "embarrassing" and "harmful to [the] department." (*Id.* at 85).

After consulting with the City's lawyers, Ison determined that Bowen's posts violated various provisions of GPD's Speech Policy, GPD's Standards, and the Handbook social media policy. (Filing No. 50-5, Ison's Answers to Interrogs. at 5–6). Ison believed Bowen's posts violated the policies "because they were expressions of the personal criticisms, personal grievances, and personal hostility that Bowen held against" Ison and Myers, "his highest-ranking and ultimate superiors." (*Id.* at 6). Ison testified that he believed Bowen's posts were discourteous, disrespectful, unprofessional, and insubordinate. (Ison Dep. at 15, 18, 27). He also testified that the posts were

"embarrassing" to GPD and "damaging" to Ison's credibility in the eyes of the public and his staff.  (*Id.* at 16–17, 19, 27).

**E.  Revocation of Privileges**

On May 2, 2023, the day of the primary election, Ison informed Bowen that, effective immediately, his take home car privilege and his off-duty employment privileges were revoked.  (*Id.* at 12, 43; Bowen Decl. ¶¶ 13, 15; *see* Bowen Dep. Ex. 8). As a result, Bowen could no longer use his police car for personal use or drive it home after his shift, and he could no longer work off-duty security assignments that required an actual off-duty police officer.  (Bowen Decl. ¶ 16).

Later, Ison testified that he decided to revoke Bowen's privileges because his Facebook posts violated GPD policies, were inaccurate and unsubstantiated, publicly disrespected Myers's and Ison's authority, and tried to damage Ison's credibility in the eyes of the public and local news media, embarrass GPD, and diminish Ison's authority in the eyes of his staff.  (Ison Dep. at 13, 15–22, 26–36, 41–43).  He also testified that he "could have imposed formal discipline up to termination" for Bowen's speech, but he decided instead to revoke Bowen's privileges, which is an "informal" disciplinary action he could take without the approval of the Merit Commission.  (*Id.* at 36–38).  Ison told Bowen that the decision to revoke Bowen's privileges "was solely within his discretion." (Bowen Decl. ¶ 17).  He did not write Bowen up for violating any policies.  (Merit Comm'n Hr'g Tr. at 172).

## II.      Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing cross-motions for summary judgment, the court "view[s] all facts and inferences in the light most favorable to the nonmoving party on each motion."  *Wis. Alumni Rsch. Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010).

## III.      Discussion

Bowen brings a First Amendment retaliation claim, alleging Ison retaliated against him for posting on Facebook by revoking his employment privileges.  (Filing No. 13, Am. Compl. ¶ 31).  Bowen also brings a *Monell* claim, alleging the City is liable for Ison's conduct because he is "the final policy-making authority for the GPD."  (*Id.* ¶ 44).[2] The parties cross-move for summary judgment on both claims.

### A.      Section 1983 Claim Against Ison

Public employees "do not surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  That said, they accept "certain limitations" on their rights.  *Id.* at 418.  After all, "[g]overnment

---

[2] In his amended complaint, Bowen also brought a second retaliation claim against Ison (Count 2) and a breach of contract claim against the City (Count 4).  (Am. Compl.).  The court granted the parties' joint motion to dismiss those counts on June 4, 2024.  (Filing No. 41).

employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* Therefore, to establish a First Amendment retaliation claim, a public employee must first "prove that [his] speech is constitutionally protected." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016). Accordingly, to succeed on his retaliation claim, Bowen must show that (1) he "engaged in constitutionally protected speech"; (2) he "suffered a deprivation likely to deter protected speech"; and (3) his protected speech was "a motivating factor in the deprivation." *Harnishfeger v. United States*, 943 F.3d 1105, 1112 (7th Cir. 2019).

There is no question that Ison's decision to revoke Bowen's privileges was motivated by Bowen's speech, so this case turns on whether Bowen engaged in protected speech, which is a question of law to be decided by the court. *E.g.*, *Kubiak*, 810 F.3d at 481; *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013). For his speech to be constitutionally protected, Bowen must show "that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (cleaned up) (quoting *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)).

For the purposes of summary judgment, Defendants concede that Bowen was acting as a private citizen when he made his Facebook posts. The parties, however,

dispute whether Bowen's speech addressed a matter of public concern and whether Bowen's interests outweighed his employer's.

### 1.    Matter of Public Concern

First, the parties dispute whether Bowen's speech addressed a matter of public concern.  Bowen contends that his speech touched on a variety of topics important to public debates going on in Greenwood related to the upcoming primary.  Defendants contend Bowen's speech amounted to nothing more than disrespectful name-calling that focused on personal, not public, concerns.

A matter of public concern is a "legitimate news interest" or "a subject of general interest and value and concern to the public." *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)).  To determine whether Bowen's posts addressed a matter of public concern, the court considers "the content, form, and context" of the statements at issue "as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).  The court "look[s] at the overall objective or point of the speech, as ascertained by those three factors," of which "content is the most important." *Kubiak*, 810 F.3d at 483.

The speaker's motive is also relevant, but not dispositive. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009).  It is relevant "to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected . . . if the only point of the speech was to further some purely private interest." *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002) (cleaned up).

The court begins by looking at the content of Bowen's speech. Many of Bowen's Facebook comments discuss Ison's management of GPD officers and officer morale—both of which affected Bowen personally as an employee. However, Bowen's posts do not identify him as police officer or share personal anecdotes about his work. Generally, the posts provide Bowen's opinion on crime rates in Greenwood, GPD's lack of transparency, and Myers's and Ison's integrity and qualifications. These are undoubtedly topics important to the Greenwood community, not just Bowen. *See, e.g.*, *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002) ("[P]olice protection and public safety are generally a matter of public concern."). While he certainly engaged in some name-calling and joking in his posts, Bowen also advocated for changes to GPD practices, shared his opinion of political candidates, and encouraged others to question the City's current administration. This indicates Bowen wanted to "inform the public debate on" issues "of legitimate interest to the public at the time" the posts were made. *Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 381; *see Kristofek v. Village of Orland Hills* (*Kristofek I*), 712 F.3d 979, 986 (7th Cir. 2013) ("[I]f an objective of the speech was . . . to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern.").

Turning to the context and form of Bowen's speech, Bowen's decision to share his statements on public, local Facebook pages also evinces a desire to contribute to public debates of concern to Greenwood residents, rather than merely air personal grievances. *See Kingman v. Frederickson*, 40 F.4th 597, 602 (7th Cir. 2022) (reasoning that plaintiff's decision "to air his concerns" in a public city council meeting, "rather than privately with

14

individual councilmembers or in a closed session," suggested "he intended to speak . . . on a matter of concern to his fellow [city] residents").  Additionally, nearly all of Bowen's posts were made in response to posts or comments left by other Facebook users about crime in Greenwood or the upcoming election, which further indicates a desire to participate in a public discussion on topics of interest to the community.  (*See* Facebook Comments).

To be sure, Defendants present evidence suggesting Bowen's speech was at least partly motivated by his personal resentment about his treatment at GPD.  For example, some of Bowen's comments discuss Ison "policing the[] police," "tanking morale" at GPD, and retaliating against officers.  (*Id.* at 4, 9).  And Defendants point out that Bowen began posting on Facebook around the time he received his first reprimand, began feeling like he was being retaliated against, and compiled a document of evidence that Ison violated GPD policies.  However, that Bowen's speech "was partly motivated by personal concerns does not . . . mean the speech cannot also be a matter of public concern." *Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010).  And as the court explained above, Bowen's speech "went far beyond complaints regarding his individual employment situation" and were not motivated merely "by purely personal grievances."  *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000).

In sum, the court concludes Bowen's speech addressed matters of public concern.

## 2.    *Pickering* Balancing

Even if a public employee shows that he spoke as a private citizen on a matter of public concern, for his speech to be constitutionally protected, he must prevail under the

15

balancing test set out in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Pickering* requires the court to weigh the employee's interests in speaking on matters of public concern against the government employer's interests in promoting the efficient provision of public services. *Id.* at 568. If the employer's interests weigh heavier in the balance, its disciplinary action against the plaintiff employee "does not violate the First Amendment." *Swetlik*, 738 F.3d at 827 (citing *Garcetti*, 547 U.S. at 418).

In balancing the employer's and employee's interests, the court considers the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Lalowski v. City of Des Plaines*, 789 F.3d 784, 791 (7th Cir. 2015) (quoting *Gustafson*, 290 F.3d at 909). The court "need not address each factor in each case." *Harnishfeger*, 943 F.3d at 1115. After all, "[t]he initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office." *Volkman*, 736 F.3d at 1092 (quoting *Knapp v. Whitaker*, 757 F.2d 827, 842 (7th Cir. 1985)).

In the present case, some factors certainly weigh in Bowen's favor. Although his posts appear to be at least partly motivated by his personal grievances, Bowen had a legitimate interest in sharing his opinion on topics of public concern relevant to the 2023

primary election. "[F]ree and open debate" about elections "is vital to informed decision-making by the electorate." *Pickering*, 391 U.S. at 571–72. As a police officer, Bowen was well suited to provide an opinion on crime rates and the current administration's approach to public safety. *See id.* at 571 (noting "it is essential" that teachers "be able to speak out freely" on questions of school funding as "the members of the community most likely to have informed and definite opinions" on that topic); *Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("Government employees are often in the best position to know what ails the agencies for which they work . . . ."). The sixth factor therefore weighs in Bowen's favor. Additionally, neither his posts nor his Facebook page identified him as a police officer, so the seventh factor goes to Bowen as well.

However, the record, even viewed in the light most favorable to Bowen, reveals that his employer's interests weigh more heavily in the balance. Ison's interests in disciplining Bowen were substantial.

The Seventh Circuit has made clear that the court's "primary consideration here is the nature of the employer-employee relationship in the paramilitary context" of a police department. *Volkman*, 736 F.3d at 1092; *Lalowski*, 789 F.3d at 791–92; *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999). "Speech that might not interfere with work in an environment less dependent on order, discipline, and esprit de corps could be debilitating to a police force." *Kokkinis*, 185 F.3d at 845 (quoting *Breuer v. Hart*, 909 F.2d 1035, 1041 (7th Cir. 1990)). Police departments therefore have "a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to promote efficiency, foster loyalty and obedience to superior

officers, maintain morale, and instill public confidence.'" *Id.* (quoting *Tyler v. City of Mountain Home*, 72 F.3d 568, 570 (8th Cir. 1995)). Accordingly, the court gives "considerable deference" to a police department's "assessment of the risks that [an] employee['s] speech creates." *Volkman*, 736 F.3d at 1092; *Kokkinis*, 185 F.3d at 845 ("Deference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement."). Additionally, because "the disruptive nature of an employee's speech is so important in the context of law enforcement," a police department "is allowed to consider both the actual *and* the potential disruptiveness" of an employee's speech. *Kristofek v. Village of Orland Hills* (*Kristofek II*), 832 F.3d 785, 796 (7th Cir. 2016) (emphasis in original).

Here, the record amply supports Defendants' position that Bowen's posts created actual and potential problems for Ison. The record reflects that Bowen's speech raised concerns for and caused embarrassment to several members of the GPD, including Ison. For example, the Merit Commission president questioned Ison's decision not to punish Bowen's speech and discussed with Ison what precedent allowing the posting to continue would set for the future. She also advised Ison that the Merit Commission could discipline Bowen if Ison did not. Additionally, other GPD officers brought Bowen's posts to Ison's attention. They questioned his decision not to put a stop to the posts and reported that they believed the posts were embarrassing and damaging to GPD's reputation—an opinion Ison shared. This evidence indicates Bowen's speech "damaged his superiors' and fellow officers' confidence in him" and Ison and, at the very least,

"potentially endangered . . . working relationships" within GPD. *Kokkinis*, 185 F.3d at 846.

Even if Bowen's speech did not actually cause any disharmony within GPD or disrupt GPD's work, the potential for disruption was apparent. In short, Bowen's posts accused Ison of being a liar, being unfit for and bad at his job, not caring about or listening to his officers, lying about crime rates, and retaliating against and policing officers. They also accused GPD of not being transparent with the public. Viewing Bowen's posts through Ison's eyes, *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 903 (7th Cir. 2024), they degraded the integrity of GPD and undermined Ison's authority. Under these circumstances, Ison reasonably felt that Bowen's speech would disrupt the operations of GPD by impairing its relationship with the community and threatened disharmony within GPD's ranks by damaging Ison's reputation.

Bowen insists that his speech could not create issues of discipline or harmony because he did not have daily, close contact with Ison or Myers. He relies on *Pickering*, which involved a teacher who was fired by the school board for sending a letter critiquing the board to a local newspaper. 391 U.S. at 564–66. There, in weighing the parties' interests, the Supreme Court reasoned that the teacher's speech did not pose a threat to maintaining discipline or harmony in the workplace because the teacher's relationship to the board and superintendent was "not the kind of close working relationship[] for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Id.* at 570. This reasoning actually supports Defendants' position, not Bowen's. A police officer's relationship to his police chief and the mayor (his

ultimate supervisors) is very different than a teacher's relationship to the school board. Loyalty to superior officers and teamwork are essential to the proper functioning of a police department. *See Kokkinis*, 185 F.3d at 845 (noting there "is a particularly urgent need for close teamwork . . . in the 'high stakes' field of law enforcement" and that police departments have a "significant interest" in regulating their employees to "foster loyalty and obedience to superior officers" (first quoting *Breuer*, 909 F.2d at 1041; and then quoting *Tyler*, 72 F.3d at 570)). Therefore, in sum, the first and second factors weigh in Ison's favor.

Relevant here too is the fourth factor: the manner of Bowen's speech. Although Bowen posted the content in question when he was off duty, he chose to post it on public, local Facebook pages, where "any member of the public" or GPD "could have come across" his disparaging remarks about Ison and GPD. *Hicks*, 109 F.4th at 903. Bowen's use of social media therefore "increase[d] the potential for department disruption," which "favor[s] the employer's interest in efficiency." *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016); *see Hicks*, 109 F.4th at 903 (noting plaintiff's use of his public Facebook page to distribute his speech weighed in favor of the employer); *Kristofek II*, 832 F.3d at 797 (recognizing "that a police department employee could pose a serious threat to department discipline and harmony if he openly and repetitively claimed that top-ranking departmental officials" were corrupt).

Finally, turning to the third factor, Bowen's speech conflicted with one of his "most important duties" as a police officer: to "foster a relationship of trust and respect with the public" and to "safeguard the public's opinion" of the police. *Lalowski*, 789 F.3d

at 792 (quoting *Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006)).  Police

departments depend "on the respect and trust of the community" to function effectively.

*Id.* (quoting *Locurto*, 447 F.3d at 178).  By calling Ison a liar and accusing the GPD of

hiding information from the public, Bowen "compromised the community's trust in its

police officers," regardless of whether his posts identified him as a police officer.  *Id.*

The third factor therefore goes to Ison.

In sum, the court concludes that Ison's interests in maintaining order and running

his department efficiently outweighed Bowen's interest in speaking out on Facebook.

Thus, having concluded that *Pickering* balancing favors the employer, the court

concludes Ison is entitled to summary judgment on Bowen's First Amendment retaliation

claim.

### B.    *Monell* Claim Against the City

Bowen also brings a *Monell* claim against the City, alleging it is liable for Ison's

conduct because he is "the final policy-making authority for the GPD."  (Am. Compl.

¶ 44); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 694 (1978); *Montano v.

City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008) (explaining a municipality can be

liable for a constitutional violation "caused by a person with final policymaking

authority").  Because the court already found as a matter of law that Ison's decision to

revoke Bowen's privileges was not a constitutional violation, the City is entitled to

summary judgment on Bowen's municipal liability claim.

**IV.     Conclusion**

Plaintiff's Motion for Partial Summary Judgment with Respect to Liability (Filing No. 34) is **DENIED**.  Defendant's Motion for Summary Judgment (Filing No. 48) is **GRANTED**.  Final judgment shall issue by separate order.

**IT IS SO ORDERED** this 20th day of February 2025.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.